**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-00310 (JGP) |
| | ) | |
| UNITED STATES SECRET SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S SURREPLY TO DEFENDANT U.S. SECRET SERVICE'S
REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

Plaintiff, Judicial Watch, Inc., ("Judicial Watch") by counsel, respectfully submits this

surreply to Defendant U.S. Secret Service's ("Secret Service") reply in support of its motion to

dismiss.  In support therefor, Judicial Watch states as follows:

**MEMORANDUM OF LAW**

I.    **Introduction.**

In its reply brief, the Secret Service renews its claim that this case is moot.  A more

accurate statement would be that the Secret Service claims this case is moot *again*.  Despite the

fact that, between the time of its motion to dismiss and its reply brief, the Secret Service

conducted a second search and located almost *three times* the number of responsive records

initially produced, the Secret Service boldly maintains that its first search satisfied its FOIA

obligations.  The Secret Service's poker-face notwithstanding, its reply not only fails to support

its motion to dismiss, it actually creates an even greater degree of uncertainty and confusion.  The

Secret Service argues in its reply brief that Judicial Watch's opposition, in which it argued that

the Secret Service's first search was insufficient, was based on speculation alone.  However, the

Secret Service's subsequent search and release of substantially more responsive records as a result of that second search easily leads to the conclusion that Judicial Watch's opposition was not based on speculation alone, and, in fact, that Judicial Watch's opposition was correct.

## II.    Argument.

### A.    The Secret Service's Claim That This Case Is Moot Is Undermined By Its Own Actions and Admissions.

The Secret Service tries very hard to convince the Court as well as Judicial Watch, that the change in circumstances – namely, the allegedly newly discovered responsive records – in no way affects its claims that (1) it performed an adequate initial search; and (2) it produced all responsive records to Judicial Watch both on May 10, 2006 *and* on July 7, 2006. The difficulty with the Secret Service's claims, however, is that its own actions and admissions prove otherwise.

### 1.    The Secret Service's First Search Was Not Reasonable.

In its reply brief, the Secret Service maintains that the first search was reasonable. Defendant's Reply In Support of Its Motion to Dismiss ("Reply") at 3, 6. However, the Secret Service's own actions and admissions demonstrate that this is simply not the case. First, it is uncontested that the Secret Service undertook a second search. Assuming *arguendo* that the Secret Service believed the first search to be reasonable up to and including May 10, 2006, at some point after May 10, 2006 this belief obviously changed. The Secret Service claims that, in the midst of another unrelated search, it happened upon WAVES logs on a hard drive. Reply at 4. Those records "turned out" to be WAVES logs responsive to Judicial Watch's FOIA request.[1]

---

[1]    The Secret Service continues to be mystified by the term "agency records." Reply at 3, n.2. Putting aside the issue of the records transferred from the Secret Service, the records

*Id.* at 4-6.  Because of the nature of these newly-discovered records, the Secret Service undertook

a second search.  *Id.* at 5.  Clearly, however, there would be absolutely no reason to expend the

time and manpower necessary to conduct a second search if the Secret Service thought its first

search was adequate.

Second, it strains logic to claim the Secret Service's first search was reasonable when its

second search yielded significantly more responsive documents.  On May 10, 2006, the Secret

Service produced a mere two (2) pages of responsive records, whereas, on July 7, 2006, the

Secret Service produced more than fifty (50) pages of responsive records.  And while it is true

that the new records are repetitive in nature – the same information being released in several

different forms – they document at least five (5) additional visits by Jack Abramoff to the White

House that were unaccounted for in records from the first search.[2]

Third, the allegedly newly discovered records were discovered in the *same location* as the

records located in the first search.  In its reply brief, the Secret Service claims that the new

records were found on the Information Technology Section of the Secret Service's Presidential

Protective Division (PPD").  Reply at 4.  The Secret Service discovered these allegedly newly

discovered records on two computers in the PPD.  *Id.* at 4.  In its original motion to dismiss, the

---

created by the Secret Service and possessed by the Secret Service most certainly fit the FOIA
definition of agency records.  The Secret Service admits as much in its reply brief.  Reply at 12-
15 (referring to the importance of "control" over the records).

[2]     In its first production, the Secret Service released documents reflecting two (2)
Jack Abramoff visits to the White House: March 6, 2001 and January 20, 2004.  Reply at 3.  In
its second production, the Secret Service released five (5) additional visits: March 1, 2001, April
20, 2001, May 9, 2001, May 17, 2001, and December 10, 2001.  *See* Reply Exhibits 2-5.  While
unconfirmed by the Secret Service, documents reflecting an additional visit on December 11,
2001 also appear in the new release.  *See e.g.,* Reply Exhibit 3, page 2, 5; Exhibit 4, page 1, 3;
Exhibit 5, page 2.

Secret Service stated that it was "Presidential Protection Division personnel" who conducted the first search. Defendant's Memorandum In Support of Its Motion to Dismiss ("Dismiss") at 6. In fact, according to the first declaration of Kathy Lyerly, the PPD personnel who conducted the first search did so "as part of their regular responsibilities." Declaration of Kathy J. Lyerly ("First Lyerly Decl.") at ¶ 9. Yet, despite being found in the same location and by the same division, the Secret Service clings to its claim that the second search does not affect the adequacy of the first search. The Secret Service's own actions and admissions demonstrate the opposite.

Fourth, since the Secret Service has stated and Ms. Lyerly has sworn to the fact that is it the PPD's responsibility to conduct FOIA searches, it was unreasonable for the PPD not to have searched its own computer databases during the first search. The "new" records were discovered within Microsoft Access database files. Second Declaration of Kathy J. Lyerly ("Second Lyerly Decl.) at ¶ 5. A simple, general search on these two computers would have either ruled out the existence of WAVES logs, or, as in this case, would have located the WAVES logs.[3] Requiring the Secret Service to run a simple database search on its computers – especially the computers used to transfer the WAVES information to CD-ROMs – was not unreasonable or unlikely to yield responsive records. Second Lyerly Decl. at ¶¶ 10-11 (explaining that it was the very same computers used in the WAVES data transfer that contained the newly released records). In fact, such a search was required to satisfy the reasonableness requirement of a FOIA search.

---

[3]     The Secret Service's elongated description of the computer search, including the new automated search function and manual review of the records, muddies the important point: the existence of the WAVES records was easily found through a simple Microsoft Access database search. The subsequent automated search programs and manual review only occurred after the existence of the WAVES data was discovered. It was at this point that it became necessary to perform a more thorough search.

The burden of persuasion as to the reasonableness of the search falls on the Secret

Service. *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983). This evidence must be viewed

in the light most favorable to Judicial Watch. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365,

368-69 (D.C. Cir. 1980). Additionally, if the reasonableness of the search is challenged, as it is

in this case, the Secret Service must "demonstrate 'beyond a material doubt' that the search was

reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (*quoting Weisberg v.

U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). As demonstrated above, the Secret

Service has not done so, as material doubt still exists.

> **2.     The Reasonableness of the Secret Service's Second Search Is In Doubt.**

The Secret Service claims that its second search has produced all the relevant

documents Judicial Watch "could hope to obtain from a judgment of this Court." Reply at 1. In

fact, this is the very same claim the Secret Service made in its original motion to dismiss.

Dismiss at 1-2. The Secret Service's recycled claims notwithstanding, the fact that a second

search was conducted and a second production of responsive documents made, at the very least

suggests strongly that, the inadequacies of the Secret Service's first search may have carried

over.[4] And, this is just one of the difficulties the Secret Service's reply brief raises. Simply put,

and discussed in further detail below, the Secret Service's reply brief, as well as the second

---

[4]     The Secret Service's reliance on *Meeropol v. Meese*, 790 F.2d 942, 952-53
(D.C.Cir. 1986) is unwarranted. The Court took note of the fact that the FOIA search was large
in size and spanned four decades and that the FBI had cooperated with the plaintiff throughout
the court-ordered discovery. None of those factors are present here: the search is concise in
nature incorporates only one subject, and covers only a five-year span. Additionally, the Secret
Service's cooperation has been explicitly challenged by Judicial Watch's motion to compel and
for sanctions.

Lyerly declaration, fail to demonstrate that the second search was reasonable.

**B.     The Secret Service's Reply And Accompanying Documents Create Even More Uncertainty And Confusion.**

Far from clarifying the Secret Service's two searches and productions of documents, the Secret Service's reply brief and second Lyerly declaration create greater uncertainty and confusion.[5]  Several inconsistencies found in these newly filed documents illustrate the point.

**1.     The Second Lyerly Declaration Cannot Be Relied Upon**.

Kathy Lyerly swore to the adequacy of the first Secret Service search.  First Lyerly Decl. at ¶ 19.  She swore that the search was "conducted under [her] direction" and produced only two (2) records.  *Id.* at ¶ 3.  Ms. Lyerly further described the first search in greater detail later and stated that the search was "conducted under the direction of the Secret Service's Presidential Protective Division [] personnel who conduct FOIA searches as part of their regular responsibilities."  *Id.* at ¶ 9.  Most importantly, Ms. Lyerly swore that the Secret Service had no other responsive records.  *Id.* at ¶¶ 17, 18.  After filing that first declaration, it was subsequently discovered that the Secret Service did, in fact, possess of more responsive records.

In her second declaration, Ms. Lyerly reveals that the very personnel who were responsible for the search at issue, and FOIA searches in general, did not know about the existence of WAVES records on two computer hard drives. Second Lyerly Decl. at ¶¶ 12.   In fact, Ms. Lyerly reveals that the individual in charge of the Information Technology Section of

---

[5]     Judicial Watch continues to maintain that the records transferred by the Secret Service to the White House should be retrieved by the Secret Service.  This point is dealt with more fully in Judicial Watch's reply to the Secret Service's Amendment, also filed today.

the PPD was unaware that the WAVES data existed on the hard drives.  *Id.*  Setting aside the

disturbing fact that the individual in charge was allegedly in the dark, Ms. Lyerly attempts to

disregard an even bigger problem: she is the individual whose sworn statement Judicial Watch

and the Court must rely on, and *she* was in the dark.  Ms. Lyerly swore to the fact that she was

familiar with the first search and, in fact directed the first search.  And yet, as the facts have

demonstrated and she has admitted, this cannot be the case, as the first search did not yield all of

the records in the Secret Service's possession, and the "new" records were discovered on

computers in the same division, and after running a simple Microsoft Access database search.

 Assuming *arguendo* that Ms. Lyerly never purposefully withheld responsive documents,

her subsequent admissions that the first search was done by individuals who were without the

proper knowledge raises doubts about her ability to give a sworn statement regarding the

adequacy of the second search.  Government agencies are accorded a great amount of leeway and

a presumption of good faith when it comes to the affidavits and declarations submitted by

individuals employed by them.  These sworn statements must, however, be reliable.  When

reliability is called into question, the Court should require further investigation into the matter.

Additionally, Ms. Lyerly's second declaration includes a significant factual change.  In

her new declaration Ms. Lyerly now claims that Access Control Record ("ACR") data is also

downloaded from the server on to CD-ROMs.  Second Lyerly Decl. at ¶ 10.  In her first

declaration, as well as the Secret Service's original motion to dismiss, it was only the WAVES

data that was downloaded on to CD-ROMs and then erased from the hard drive.  First Lyerly

Decl. at ¶ 10.  In fact, in her first declaration, Ms. Lyerly stated that ACR records were "stored in

a searchable database" and nowhere else. *Id.* at ¶ 12.  This factual change now raises questions

about whether additional ACR records exists, and if they do, whether they too have been transferred to the White House.

### 2. Miscellaneous Inconsistencies and Uncertainties That Make the Adequacy of the Secret Service's Second Search Unreliable.

In addition to the troublesome aspects of the conflicting Lyerly declarations, the Secret Service's reply brief contains several other inconsistencies and uncertainties which call into question the adequacy of the second search. For example, the Secret Service claims that it performed a new search after it inadvertently discovered WAVES data during another, unrelated search. Reply at 5-6. However, in a footnote on the same page, the Secret Service states that one of the sets of responsive records released on July 7, 2006 was actually discovered by "one of defendant's employees after defendant first learned of the records on the hard drives, but prior to the search by the Office of Inspection team." *Id.*, n.5; Exhibit 2. This point is important for three reasons. First, it suggests that there were actually three searches performed. Second, it would appear that the newly discovered data was accessible without all of the bells and whistles described by the Secret Service.[6] Lastly, the Secret Service fails to account for where this set of

---

[6] The Secret Service described the "lengths" to which it went to retrieve these documents. It included a "special team of investigators" and "going so far as to write a special program." Reply at 1, 5. However, upon closer review of the reply brief and Ms. Lyerly's second declaration, it appears that not only were these steps taken *after* the WAVES logs were initially discovered through a simple database search, but the Secret Service's description of its efforts was greatly exaggerated. The "special program" written and employed by the Secret Service was "an automatic search function," which was written for the purpose of searching the database files. Second Lyerly at ¶ 8. The "special program" was created as a means for the Secret Service to employ an automated search, and thus save the team from manually searching the databases. In the end, the great lengths the Secret Service went to were merely designed to make its job easier, not as a means of actually locating responsive records.

documents was found, or how the employee discovered the data.[7]

Another example of uncertainty is the Secret Service's claim that the newly produced responsive records "do not necessarily reflect actual entries to and exits from the White House." Reply at 5, n.4. In addition to contradicting WAVES stands for (Worker and Visitor *Entrance* System), the statement is contradicted by the actual records released on July 7, 2006. For example, on the second page of Exhibit 2 to the reply brief, there is a column of "TOA" and "TOD." These are commonly understood to be short for "time of arrival" and "time of departure." The third page of Exhibit 2 contains columns entitled "APPT START" and "APPT END." Exhibit 4 to the Secret Service's reply also clearly contains a "APPT START DATE" and an "APPT END DATE." In fact, each set of records attached to the Secret Service's reply brief includes either the "TOA" notation or an "APPT START" notation. Reply Exhibits 2-5. These notations clearly reflect actual entries and exists from the White House. Unless the Secret Service means to call into question the veracity of its record-keeping in general, this statement simply creates more confusion and uncertainty as to the documents that have been produced.

Although secondary to the larger problem of the reliability of Ms. Lyerly's declarations, these examples – which are not inclusive – help demonstrate that the Secret Service's second search is not reliable and therefore, cannot be considered adequate.

---

[7]     The Second Lyerly declaration states only that this set of documents were "printed from a hard drive of one of the computers by a PPD employee." Second Lyerly Decl. at ¶ 13. It is unclear whether this was one of the two hard drives later searched by the Office of Inspection, or another computer within the PPD.

**III.**     **Conclusion.**

For the foregoing reasons, Judicial Watch respectfully requests that the Court deny the

Secret Service's motion to dismiss.

Respectfully submitted,

JUDICIAL WATCH, INC.


 /s/ Meredith L. Di Liberto
D.C. Bar No. 487733
Paul J. Orfanedes
D.C. Bar No. 429716
501 School Street, S.W.
Suite 500
Washington, D.C. 20024
Tel.:  (202) 646-5172
Fax:  (202) 646-5199

*Attorneys for Plaintiff*