## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
JUDICIAL WATCH INC.,               :
                                   :
        Plaintiff,                 :
                                   :
            v.                     :    Civil No. 1:06-310 (RCL)
                                   :
UNITED STATES SECRET SERVICE,      :
                                   :
        Defendant.                 :
_____:


CITIZENS FOR RESPONSIBILITY AND    :
ETHICS IN WASHINGTON,              :
                                   :
        Plaintiff,                 :
                                   :
            v.                     :    Civil No. 06-883 (RCL)
                                   :
U.S. DEPARTMENT OF HOMELAND        :
SECURITY,                          :
                                   :
        Defendant.                 :
_____:
```

## PLAINTIFF CITIZENS FOR RESPONSIBILITY AND ETHICS' OPPOSITION TO DEFENDANT'S "SUPPLEMENTAL" MOTION FOR SUMMARY JUDGMENT ON CLAIMS I-III

### STATEMENT

A consistent theme runs through all of the Freedom of Information Act ("FOIA")

litigation involving requests for Secret Service records of White House visitors:  repeated

missteps by the agency that, taken as a whole, document incompetence at best and outright

misconduct at worst.  This case is no different; this theme is echoed repeatedly in the Secret

Service's [1] most recent filing, a so-called "supplemental" motion for summary judgment on CREW's[2] FOIA claims.

According to the Secret Service it is entitled to summary judgment notwithstanding that its supporting declarations are woefully deficient, it has failed to account adequately for the multiple instances in which it has missed patently responsive documents and it is advancing a legal argument that has no support in law or fact. There is only one logical conclusion to draw from its pattern of conduct: at the express direction of the White House, the defendant seeks to protect top administration officials, including the president, from the embarrassment that would flow from the disclosure that they met with now-convicted lobbyist Jack Abramoff in circumstances far different than those previously disclosed.

This conclusion flows specifically from the latest admission of the Secret Service that it has conducted additional searches and released documents as a discretionary matter only and with the express permission of the White House. Further, its latest declarations are cloaked in vague generalities that attempt to paper over the blatant holes in its searches. Defendant has engaged in delaying tactics including multiple many-month delays in bringing relevant information to the Court and disclosing or otherwise accounting for documents responsive to CREW's FOIA request, and it has invoked a "glomar-like" response to prevent the public from knowing instances of when Jack Abramoff and seven of his associates met with the president or his top aides.

---

[1] CREW's lawsuit is brought against the U.S. Department of Homeland Security ("DHS"), of which the Secret Service is an agency-component.

[2] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in Washington.

Taken as a whole, these facts and deficiencies are more than adequate to defeat defendant's claim that it is entitled to summary judgement because it has once again produced all responsive non-exempt documents.  There remain serious questions about the adequacy of the government's search and the good faith of its conduct, questions that are best addressed with tailored discovery designed to elicit facts this Court needs to resolve the issues presented by this case.[3]

## **FACTUAL BACKGROUND**

On February 2, 2006, CREW sent a FOIA request to DHS seeking "*all* records relating to *any* visit" that eight specified individuals made "to the White House or the residence of the Vice President from January 1, 2001, to the present."  Letter from Anne L. Weismann to U.S. Secret Service, February 2, 2006, p. 1 ("FOIA request") (Exhibit A to Second Amended Complaint) (emphasis added).  Those individuals include  now-convicted lobbyist Jack Abramoff and seven of his associates:  Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham and Patrick Pizzella.  Id.[4]  The term "White House" was defined to include "any office

---

[3] In its initial response to defendant's motion to dismiss, plaintiff also requested leave to conduct discovery.  That request remains pending and the many deficiencies in defendant's latest motion offer further justification for why discovery is necessary and appropriate at this stage.  Toward that end, plaintiff respectfully suggests that following disposition of defendant's motions, the Court permit plaintiff to submit a discovery plan that outlines more specifically what discovery CREW seeks and why.

[4] Conspicuously absent from defendant's characterization of CREW's FOIA request is any mention of Jack Abramoff; instead defendant describes the request as seeking records of visits made by "eight named individuals, including Shawn Vassell . . ."  Memorandum in Support of Supplemental Motion for Summary Judgment on Claims (I-III) ("D's Mem.") at 4.  Yet it is the notoriety surrounding Jack Abramoff that justified CREW's request for expedition and it is that notoriety that is likely behind the defendant's vigorous attempts to avoid public accountability for all of Mr. Abramoff's visits to the White House.

within the Executive Office of the President, the residence of the President, the Old and New Executive Office Buildings, and any other office or space on the grounds of the White House." Id. CREW's request specified that it was seeking records of "any and all kind, including electronic records, audiotapes, videotapes, photographs, and computer print-outs." Id. CREW also requested that DHS expedite its handling of CREW's request given the "endless speculation in countless media reports about what relationship Mr. Abramoff and his associates had with the White House and, specifically, the President." FOIA request at p. 3.

Ignoring CREW's request for expedition, the Secret Service acknowledged receipt of the FOIA request on March 1, 2006, and claimed that "a search for *files* responsive to [CREW's] request is being conducted."[5] Letter from Kathy J. Lyerly to Anne L. Weismann, March 1, 2006 (Exhibit B to Second Amended Complaint) (emphasis added). In addition, the Secret Service forwarded to CREW by facsimile records it had released on that date to Judicial Watch (Exhibit C to Second Amended Complaint). The cover letter to Judicial Watch accompanying that release explained that the Secret Service "only recently" "unexpectedly discovered computer files containing Worker and Visitor Entrance System (WAVES) data relating to six appointments involving Jack Abramoff" as well as additional ACR [Access Control Records] data. Id.

On May 10, 2006, having failed to receive an adequate or timely response to its request, CREW filed its complaint in this action. CREW also challenged as contrary to law DHS's policy of erasing White House visitor records once it has transferred copies to the White House.

---

[5] The Secret Service did not explain what it meant by the term "files," a term CREW's request did not employ.

CREW filed a Second Amended Complaint on July 27, 2006, to add claims under the

Administrative Procedure Act based on defendant's failure to comply with the Federal Records

Act. Those claims have now been dismissed based on the Court's conclusion that CREW lacks

Article III standing.

      CREW's lawsuit was not brought in a vacuum. Judicial Watch had filed an earlier suit

based on its FOIA request of the Secret Service for White House visitor records of Jack

Abramoff.[6] That suit has now been consolidated with CREW's and the Secret Service has also

filed a so-called "supplemental" motion for summary judgment with respect to Judicial Watch's

claims. Initially CREW's suit was consolidated with a lawsuit brought by the Democratic

National Committee for White House visitor records of Jack Abramoff and other individuals[7];

the DNC entered a stipulation of dismissal based on the government providing it some of its

requested documents. And *The Washington Post* filed suit[8] after the Secret Service refused to

produce any White House visitor records in response to the newspaper's FOIA request based on

the agency's newly minted claim that the records were presidential, not agency records and

therefore not subject to the FOIA. In addition, CREW has another suit against DHS, <u>CREW v.

Dep't of Homeland Security</u>, Civil No. 06-1912 (RCL) ("<u>CREW v. DHS II</u>"), involving a FOIA

request for Secret Service White House visitor records of specified conservative religious

leaders.

      On September 21, 2006, defendant moved to dismiss the FOIA claims in this case on the

---

[6] <u>Judicial Watch v. U.S. Secret Service</u>, Civil No 06-310 (RCL).

[7] <u>Democratic National Committee v. U.S. Secret Service</u>, Civil No. 06-842 (JGP).

[8] <u>The Washington Post v. Dep't of Homeland Security</u>, Civil No. 06-1737 (RMU).

ground that the case is moot because the Secret Service conducted a reasonable search and

released all non-exempt documents (Document 45).  This motion followed defendant's

representation, in response to a Court order of August 9, 2006, that the records in question are

not agency records (Document 36) and its attempt to settle this case by offering CREW and the

DNC responsive documents that the agency claimed were in the possession of the White House

and so not properly within the scope of this lawsuit.[9]

Contrary to defendant's representations, however, CREW did not receive any of the

documents DHS claimed to have recently released to CREW, as attested in the agency's

accompanying declaration.  See Plaintiff's Response to Defendant's Motion to Dismiss

Plaintiff's FOIA Claims and Request for Discovery (Document 48).[10]  Moreover, as CREW's

response to defendant's motion to dismiss (Document 48 ) identified, there are serious questions

outstanding about the scope of the Secret Service's search, questions for which CREW needs to

conduct targeted discovery.  Specifically, there are significant gaps in the supporting

declarations that the Secret Service offered in support of its motion and glaring inconsistencies

between the stated policies of the Secret Service as to its document retention policies and its

actual practices.  And while the Secret Service in settlement discussions had sufficient custody

and control over certain White House visitor records to offer them as part of a settlement, it

subsequently claimed a lack of custody and control over those records to justify the agency's

_____

[9] CREW did not accept the government's offer because the government refused to offer
any relief for CREW's Federal Records Act claims; the DNC accepted a settlement but it did not
include the documents purportedly in the exclusive possession of the White House.

[10] The documents were inexplicably sent to CREW's old mailing address despite the fact
that from the Complaint forward every document CREW has filed in this case has contained its
proper address.

non-production. As a result, CREW requested leave to depose Kathy J. Lyerly, the Secret

Service employee who had placed before the Court three separate declarations, as well as two

Rule 30(b)(6) deponents.

Months later, on December 12, 2006, defendant filed a declaration from Paul S.

Morrissey, Deputy Assistant Director for the Secret Service (Document 59), in which he claimed

that additional information had "come to light" about additional categories of potentially

responsive records in the course of the Washington Post case. Notably lacking in his declaration

was any information about when the agency became aware of this additional information,

although Mr. Morrissey referenced a declaration filed in Washington Post nearly two months

earlier, on October 25, 2006. In other words, defendant waited almost two months before

bringing to the Court's and the plaintiff's attention relevant information.

On September 5, 2007, in response to the Court's minute order of August 13, 2007, the

parties submitted a joint status report (Document 69). With respect to the FOIA claims,

defendant stated that it "intends to supplement its filings . . . to reflect recently discovered

information relevant to plaintiff's FOIA request." Joint Status Report at 3. Plaintiff, for its part,

noted that "defendants have refused to provide plaintiff with any information about the nature of

this [recently discovered] information" and also noted plaintiff's understanding that "defendants

have known about this information for weeks, if not longer . . ." Id. at 2.

Almost three months later, when defendant failed to supplement the record as it had

promised to do, plaintiff filed a motion to compel a supplemental filing by defendant (Document

71). In that motion, plaintiff noted it was in possession of information "suggesting that the

Secret Service, a component of defendant DHS, has records reflecting additional visits by Jack

Abramoff . . . that have not yet been produced." Plaintiff's Motion to Compel Supplemental Filing and Supporting Memorandum at 1. To date, defendant has not responded to plaintiff's motion beyond noting in its memorandum in support of its motion for summary judgment that the filing of its supplemental motion has mooted plaintiff's motion to compel. D's Mem. at 3 n.6.

On December 11, 2007, defendant filed a motion for summary judgment that it characterized as "supplemental," although it had never before moved for summary judgment on plaintiff's FOIA claims. As it has in the past, defendant has now acknowledged that there are additional responsive documents that apparently came to light as a result of other, unnamed litigation, Declaration of Craig W. Ulmer ("Ulmer Decl."), Exhibit 2 to D's Mem., ¶ 11, as well as a new category of documents, "Sensitive Security Records," that may or may not be responsive.[11] With its motion DHS released portions of large event summaries related to Shawn Vasell,[12] claiming that any delay in their release has not prejudiced plaintiff because the information is not "materially different" than the information contained in the WAVES and ACR records already released to plaintiff. See D's Mem. at 6 and n.9.

## ARGUMENT

---

[11] Although defendant has suggested that "Sensitive Security Records" are comparable to what it labeled "Additional Security-Related Records" in CREW v. DHS II, D's Mem. at 3 n.5, the record is far from clear that the two categories are the same.

[12] CREW is not challenging the withholding of dates of birth, Social Security numbers and the names of a Secret Service Uniformed Division Officer and Access Control Officer. The Secret Service has also withheld "limited security information," Ulmer Decl. at ¶ 33, but its failure to provide any additional detail makes it impossible for CREW or the Court to ascertain whether this withholding is proper. Accordingly, summary judgment as to this category must be denied on the basis of the record before the Court.

## I.  DHS HAS NOT MET ITS BURDEN OF PROVING THAT IT CONDUCTED A REASONABLE SEARCH.

The FOIA reflects a congressional decision that "open government should take precedence." Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999). Toward that end, the D.C. Circuit "require[s] agencies to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents . . . An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" Id., quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990).  If there is "substantial doubt" in the record "as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542 (notation omitted).  Moreover, while "[t]here is no requirement that an agency search every record system," an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990).

Here DHS, as the responding agency, bears the burden of proving the adequacy of its search. See, e.g., Patterson v. IRS, 56 F.3d 832, 840 (7th Cir. 1995); Maynard v. CIA, 986 F.2d 547, 560 (1st Cir. 1993).  The agency carries this burden through the submission of "detailed, nonconclusory affidavits." Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984); see also Oglesby, 920 F.2d at 68.  If on a challenge "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper," Truitt, 897 F.2d at 542, "particularly in view of 'well defined requests and positive indications of overlooked materials . . .'" Iturralde v. Comptroller of Currency, 315 f.3d 311, 314 (D.C. Cir.

2003) (citation omitted).

Agency declarations will be deemed inadequate if they do not identify what files were searched, what search terms were used and do not show that the search method was "reasonably calculated to uncover all relevant documents." Weisberg, 745 F.2d at 1485. Agency declarants must also "aver[] that all files likely to contain responsive materials . . . were searched" in order to "afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." Id. See also Iturralde, 315 f.3d at 313-14. If the agency declarations do not meet this standard, summary judgment must be denied. Landmark Legal Foundation v. EPA, 272 F.Supp.2d 59, 66 (D.D.C. 2003) ("'agency affidavits that do not denote which files were searched, or by whom, do not reflect any systematic approach to document location . . . are insufficient to support summary judgment.') (citing Weisberg, 627 F.2d at 371).[13]

When measured against these standards, it is apparent that the Secret Service has failed to carry its burden of demonstrating that it conducted an adequate search. As this Court found in CREW v. DHS II, when presented with a factual record that was, if anything, more detailed than that presented here, "[t]he Secret Service's past retention practices for WAVES and ACR records have proven to be pliant and evolving." Memorandum Opinion at 6. Missing from the record, for example, is the precise date "when . . . the Secret Service began deleting all WAVES records from its computer system" as well as when the agency "began transferring these records to the WHORM [White House Office of Records Management]." Id. Moreover, while Ms.

---

[13] See also Valencia Lucena, 180 F.3d at 326; Founding Church of Scientology v. Nat'l Sec. Agency, 610 F.2d 824, 837 (D.C. Cir. 1979).

Lyerly has attested in the instant case that the agency has a "longstanding practice" of transferring these records to the WHORM to explain why the Secret Service has no responsive records that pre-date October 2004,[14] she has failed to identify when this so-called "longstanding practice" began or why the agency changed this practice in October 2004. Without this critical information there is simply no way for the Court to determine whether the agency's failure to locate WAVES records for any period prior to October 2004 is reasonable.[15]

Moreover, as this Court noted in CREW v. DHS II, "the Secret Service has not always transferred the entire WAVES record." Memorandum Opinion at 7 (emphasis in original). Until July 2006, the agency was removing the note and comment fields when it transferred WAVES records to the WHORM. Id. For the period October 12, 2004 to July 10, 2006, however, the Secret Service "'retroactively' furnished the 'WAVES records to the WHORM that contained these fields . . .'" Id., citing 3d Morrissey Decl. at ¶ 19. It appears that the agency made this retroactive transfer of records notwithstanding the pendency of CREW's FOIA request, which was filed months earlier in February 2006. DHS's preservation obligations date back to its receipt of CREW's request, see, e.g., U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 149 (1989),[16] yet the agency has freely acknowledged destroying or otherwise disposing of

---

[14] Lyerly Decl. at ¶ 13.

[15] Indeed, all Ms. Lyerly attests to is the "*intent* of the Secret Service . . . to ensure that, once transferred, the records were erased from its computer system." Lyerly Decl. at ¶ 13 (emphasis added). She later concedes, however, that this intent was not always carried out, as evidenced by the fact that the Secret Service has found at least some records that remain, even after a transfer to the White House took place. See id. at ¶¶ 14-22.

[16] Cf. SafeCard Services, Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991) ("If the agency is no longer in possession of the document, *for a reason that is not itself suspect*, then the agency is not improperly withholding that document . . .") (emphasis added).

11

potentially responsive documents after CREW filed its request.[17]

The agency's retention policy for ACR records "is equally muddled." CREW v. DHS II, Memorandum Opinion at 8. Despite a purported "understanding" between the White House and the Secret Service about the treatment of ACR records that allegedly dates back to at least 2001, the Secret Service did not begin transferring ACR records to WHORM until May 2006. Id. Again, however, it made this transfer notwithstanding CREW's pending FOIA request.

In its response to defendant's previously filed motion to dismiss the FOIA claims, CREW pointed out these and other factual deficiencies in the record before this Court. Defendant's failure to cure these deficiencies makes clear that these are not mere oversights, but fatal defects that preclude summary judgment for defendant.

This conclusion is compelled as well by the fact that on multiple occasions the Secret Service has attested to this Court (and others) that it has produced all White House visitor records of visits by Jack Abramoff (and, in CREW's case, by seven of his associates), only to be proven wrong each time. Indeed, in the very first declaration of Kathy Lyerly that the Secret Service submitted in the Judicial Watch litigation and relied on here, Ms. Lyerly stated unequivocally at paragraph 15: "The Secret Service's search of the WAVES records maintained

---

[17] Previously DHS claimed that "[d]efendant obviously did not possess, at the time of plaintiff's FOIA request, the WAVES documents that were transferred to the White House, as they had already been sent there," citing the Lyerly Declaration as support. Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's FOIA Claims (Document 45) at 11 and n.7. As this Court recognized in CREW v. DHS II, however, what the Secret Service declarants have claimed is the agency's policy differs radically from its actual practices. Moreover, as CREW pointed out in its response to that motion (Document 48), critical details bearing on which entity has custody and control are missing such as how and where the documents purportedly under White House control are stored, and defendant's offer to provide in settlement documents it now claims are under exclusive White House control is inconsistent with its claim that it lacks custody and control over those same documents. Defendant's Response at 12-13.

by the Secret Service produced no WAVES records responsive to plaintiff's FOIA request."  Yet in her second declaration, Ms. Lyerly made the contradictory assertion that additional responsive documents reside on at least two computer hard drives.  See Exhibit 3 to Plaintiff's Response to Defendant's Motion to Dismiss (Document 48).  And on September 21, 2006, she made a third assertion, without qualification or equivocation, that "[o]n September 20, 2006, all documents responsive to CREW's February 2, 2006 FOIA request with the redactions noted were produced to CREW."  3d Lyerly Decl. at ¶ 32.  This statement has now been proven to be as false as her earlier statements.

Notwithstanding these clear factual errors, the government now attempts to justify the reasonableness of its prior searches through vague generalities that fail to address, much less explain, the significant holes in those searches.  For example, DHS argues that its original search used "reasonable methods" because it searched "the records that then had been identified as memorializing visits to the White House Complex -- WAVES and ACR records."  D's Mem. at 9.  Quite apart from the fact that DHS does not identify who made the decision to conduct such a limited search or why the agency's initial search was so narrowly focused, DHS ignores the fact that CREW's request is not limited to WAVES and ACR records.  CREW is seeking "*all* records relating to *any* visit" that eight specified individuals made "to the White House or the residence of the Vice President from January 1, 2001, to the present. FOIA Request (emphasis added).  Moreover, CREW is seeking both paper and electronic records, including photographs.  Id. There is simply no excuse for the agency's decision to search only two categories of records, and DHS does not otherwise explain or account for the exceedingly narrow focus of its initial search.

Similarly, DHS supplemented the record on December 15, 2006, with additional searches

it claimed to have conducted of additional categories of records (Secret Service Form 1888s, work orders and other files, "hit" reports, special event lists for the vice president's residence, daily watch commander journals)[18] and its unexpected discovery of "a number of paper access requests and related and unrelated documents, covering the period March 2001 through October 2001, in an unexpected location." Morrissey Decl. at ¶ 7. The Secret Service did not, however, explain why the agency did not consider searching these categories of documents initially and merely offered the cryptic statement that "additional information has come to light about the universe of records potentially responsive to CREW's request . . ." Id. at ¶ 3.

Even more troubling, the agency held on to this information for months before updating the Court and the plaintiff on the newly discovered documents and additional searches. As Mr. Morrissey explained when the government finally came forward, this information is contained in a declaration he had filed nearly two months earlier, on October 25, 2006, in the Washington Post case. Morrissey Decl. at ¶ 3. Yet the Secret Service did not produce this patently relevant information in this case until December 12, 2006. Notably, Mr. Morrissey did not explain when the agency became aware of these facts, which could have been earlier still, and the agency offered no explanation for its substantial delay in updating the Court and CREW with the results of additional searches, one of which yielded an additional responsive document.

The Secret Service's latest supplement to its search, which adds the new category of "Sensitive Security Records" to the list of previously unsearched records, is equally as egregious. Mr. Morrissey states that "[t]he Secret Service now believes that Sensitive Security Records could be responsive," Second Declaration of Paul S. Morrissey at ¶ 4 ("2d Morrissey

---

[18] See Declaration of Paul S. Morrissey ("Morrissey Decl.") (Document 59) at ¶¶ 3-6.

14

Decl."), but offers no explanation for this new-found realization.  While defendant's counsel

offers the justification that "it is not remarkable . . . that defendant did not, at the start of this

case, focus on Sensitive Security Records" given "the primary purpose" of those records, D's

Mem. at 9, this ignores the critical fact that CREW's request did not seek records, the primary

purpose of which is to track White House visitors, but "*all records relating to any visit*" of

specified individuals.   Moreover, even if the agency's initial failure to search for these records

were justified (which it is not), DHS's failure to account for these records until now is still

inexcusable given Mr. Morrissey's claim that Sensitive Security Records are the same as those

records referred to seven months ago as "Additional Security-Related Records" in <u>CREW v.

DHS II</u>.  Id. at ¶ 3 n.1.[19]  Just as inexcusable is the defendant's failure to live up to its promise,

made to the Court in September 2007, to "supplement its filings . . . to reflect recently

discovered information relevant to plaintiff's FOIA request."  Joint Status Report at 3.[20]

Defendant did not come forward with this information until after plaintiff moved to compel the

submission and even then did not respond directly to plaintiff's motion, thereby attempting to

avoid accountability for its failure to timely advise the Court and the plaintiff of new and highly

relevant information.[21]

---

[19] Given the ambiguity and secrecy surrounding the agency's description of Sensitive
Security Records and its reliance on a glomar response, it is difficult to confirm whether or not
they are, indeed, the same type of records for which the agency asserted an exemption in <u>CREW
v. DHS II</u>.

[20] As CREW pointed out in that same filing, even then the information had been known
to defendant for at least weeks and was not properly characterized as "recently discovered."  <u>Id.</u>

[21] Mr. Morrissey's latest declaration, offered to support the reasonableness of the
agency's latest search, is troubling in other respects as well.  For example, Mr. Morrissey fails to
explain or justify why the agency did not before now search records that reflect visitor parking

The reasonableness of defendant's search is also called into question by its admission that it has produced only those records authorized by the White House and only as a discretionary matter. See, e.g., Ulmer Decl. at ¶ 5 (additional searches by Secret Service were "conducted only after they were authorized by the Office of the Vice President and/or the Office of the President . . ."), ¶ 7 (copies of two documents "are being released to CREW" "[a]t the direction of the Office of the President"); 2d Morrissey Decl. at ¶ 5 (new searches conducted only after they were authorized by the Office of the President and the Office of the Vice President"), ¶ 7 (search of certain large event summaries conducted "with the authorization of the Office of the President and the Office of the Vice President"); D's Mem. at 4 n.7 (additional document released to CREW in December 2006 "as a discretionary matter."). These admissions give voice to what has been apparent from the outset of this litigation: the Secret Service is acting at the express direction and only with the express permission of the White House. The government's burden here, however, is to demonstrate that it conducted a reasonable search of all potentially responsive records, not just those records that the White House is willing to have produced.

Taken as a whole, these delays and persistent factual gaps in the record tell a story not of "diligent and thoughtful efforts" by defendant to "discover responsive records," D's Mem. at 10,

---

requests beyond noting his own view that "[i]t is questionable" whether these records "are even responsive to CREW's request," a curious claim given the unlimited nature of that request. See 2d Morrissey Decl. at ¶ 5. Similarly, Mr. Morrissey states that for the first time WAVES and ACR records on CD-ROMs were searched for the period June 25 through July 6, 2006, "because of the belief that the previous searches encompassed only records downloaded from the server as of the dates of these searches." Id. at ¶ 8. Who had that belief and what formed that belief are unknown, making it impossible for the Court to assess the reasonableness of the agency's current claim that its searches are adequate.

but rather an inexcusable derogation of defendant's statutory obligations to CREW and its legal obligations to this Court. Defendant's repeated mantra that it acted reasonably is simply no substitute for the factual proof it must provide documenting that, in fact, its searches were reasonable.

## II. DHS HAS NOT DEMONSTRATED THAT ITS SO-CALLED "SENSITIVE SECURITY RECORDS" ARE PROPERLY EXEMPT FROM DISCLOSURE.

For the first time DHS has also identified an entirely new category of documents, "sensitive security records," that the agency claims are both categorically exempt from disclosure pursuant to Exemptions 2, 7(E) and 7(F) of the FOIA and properly subject to a "glomar" response. DHS makes this extraordinary response despite the fact that in CREW v. DHS II, the agency invoked specific exemptions for specific "security-related documents," which it now claims are identical to "sensitive security records." Nomenclature aside, the blatant inconsistencies between the agency's handling of records here and in CREW v. DHS II fatally undermine its latest reliance on a glomar response. Moreover, the agency has not demonstrated that the records in their entirety are categorically exempt from disclosure.

### A. DHS Cannot Properly Rely On A Glomar Response Here.

The courts have recognized that in some extraordinary circumstances an agency can neither confirm nor deny the existence of responsive documents, a so-called "glomar response,"[22] because merely to reveal whether or not the responding agency had documents would itself reveal information that is either classified or otherwise exempt. See, e.g., Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (CIA "may refuse to confirm or deny the existence of

---

[22] Glomar refers to the subject of the FOIA request at issue in Phillippi v. CIA, 546 F.2d 1009, 1013 (D.C. Cir. 1976), the Glomar Explorer submarine retrieval ship.

records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception.") (quotation omitted). A glomar response is used only where an agency cannot speak to the very existence of responsive records and, as such, is an entirely different matter than whether any particular record or record portion is properly exempt from disclosure. Id. at 380. Moreover, as at least one court has warned, "[t]he danger of Glomar responses is that they encourage an unfortunate tendency of government officials to over-classify information, frequently keeping secret that which the public already knows, or that which is more embarrassing than revelatory of intelligence sources or methods." ACLU v. Dep't of Defense, 389 F.Supp.2d 547, 561 (S.D.N.Y. 2005).

Here, without expressly invoking a glomar response,[23] DHS has claimed with respect to sensitive security records that it can neither confirm nor deny "the existence of potentially responsive records with respect to any single individual without compromising its ability to carry out its protective function." D's Mem. at 10. In support DHS cites to paragraph 22 of the Ulmer Declaration, a reliance that is not borne out by the substance of Mr. Ulmer's testimony, in which he attempts to justify the agency's invocation of Exemptions 2 and 7(E), not a glomar response.

A glomar response is improper here for the additional reason that DHS has already acknowledged the existence of, and in some cases produced, documents relating to White House visits by Jack Abramoff and his associates. Even more specifically, DHS previously has acknowledged the existence of additional security-related documents, which it claims are the

_____

[23] Instead, DHS has merely noted in a footnote that "[a] refusal to either confirm or deny the existence of responsive records is a well-recognized and accepted response in circumstances such as these," D's Mem. at 11 n.12, with no explanation or demonstration of why this response is appropriate here.

same as sensitive security records, and for which it has invoked several specific exemptions.

Simply stated, the proverbial cat is already out of the bag.  See Wolf, 473 F.3d at 378 ("when

information has been 'officially acknowledged,' its disclosure may be compelled even over an

agency's otherwise valid exemption claim.") (quoting Fitzgibbon v. CIA, 911 F.2d 755, 765

(D.C. Cir. 1990)).[24]

      Under these circumstances, it appears that the government, by invoking a glomar-like

response for the entire category of sensitive security records, is not seeking to protect

legitimately classified or exempt information, but rather information that would embarrass top

executive branch officials who have denied publically that there were close contacts between the

president and Mr. Abramoff, information that is "more embarrassing than revelatory . . ."

ACLU, 389 F.Supp.2d at 561.  This approach, sanctioned by neither law nor fact, must be

rejected.[25]

---

[24] DHS notes several times that in CREW v. DHS II, CREW did not challenge the withholding of additional security-related records.  D's Mem. at 3 n.5, 10 n.11.  It bears noting that apart from being legally irrelevant, CREW made that decision under very different facts.  First, CREW did not understand in the prior case that the withheld additional security-related records would have revealed the existence of additional visits that DHS had not yet acknowledged; here, by contrast, CREW understands that the sensitive security records do relate to additional visits by Jack Abramoff and potentially others that have never been made public.  Moreover, unlike this case, DHS did not invoke a glomar-like response for those other records in CREW v. DHS II.

[25] DHS cites to one case, Brunetti v. FBI, 357 F.Supp.2d 97, 104 and n. 4 (D.D.C. 2004), in support of its claim that revealing the very existence of sensitive security records would reveal the existence of exempt information.  D's Mem. at 11.  Unlike here, however, Brunetti involved a very specific piece of information, not an entire category of documents, namely source symbols that the FBI used as unique identifiers in lieu of an informant's name.  Under the very specific facts of that case the court concluded that the source symbols were properly exempt.  If anything, this decision underscores why a glomar-like response is not available here and why, instead, DHS must demonstrate why each piece of information in a sensitive security record is exempt from disclosure under the FOIA.

**B. Defendant Has Not Demonstrated That Sensitive Security Records Are Categorically Exempt Under Exemption 2.**

Relying on declarations that are cloaked in vague generalities, DHS also argues that sensitive security records are categorically protected from compelled disclosure by Exemption 2 of the FOIA. DHS appears to be relying predominantly on the so-called "high 2" exemption for more substantive records, although it notes in a footnote with no explanation or further demonstration of proof that the "low 2" exemption for trivial administrative matters would also justify withholding some unidentified amount of information at issue here. See D's Mem. at 11 n.13.

As an initial matter, to qualify for categorical protection, the "range of circumstances included in the category [must] 'characteristically support[] an inference' that the statutory requirements for exemption are satisfied . . ." The Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 893 (D.C. Cir. 1995). "The availability of categorization does not, however, supplant the demand for particularity." King v. U.S. Dep't of Justice, 830 F.2d 210, 224 (D.C. Cir. 1987). Further, "[c]ategorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." Id.

To qualify for Exemption 2 protection, records must be "predominantly internal" and relate to internal agency rules and procedures. Crooker v. Bureau of Alcohol, Tobacco and Firearms, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc). The D.C. Circuit has emphasized the close relationship that must exist between the records and an agency rule or practice such that "disclosure could lead to disclosure of the rule or practice itself." Schwaner v. Dep't of the Air Force, 898 F.2d 793, 796 (D.C. Cir. 1990). Moreover, Exemption 2 offers protection to the

extent disclosure would risk circumvention of a statute or agency regulation.  <u>Crooker</u>, 670 F.2d at 1073-74.

Agency declarations play a key role in determining whether an agency has met its burden of justifying its withholdings, given the "asymmetrical distribution of knowledge that characterizes FOIA litigation."  <u>King</u>, 830 F.2d at 218.  As the D.C. Circuit has explained,

> [t]he significance of agency affidavits in a FOIA case cannot be underestimated.  As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld, the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected.  As we observed in *Vaughn v. Rosen*, 'this lack of knowledge by the party seeing [sic] disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution . . .

<u>Id.</u>  (citation omitted).  In the context of Exemption 2, the withholding agency must come forward with sufficient evidence documenting the potential harm from disclosure to guard against the result that "nearly every record" maintained by an agency would be swept in Exemption 2 "[b]ecause almost everything that goes on within a government agency could be said to be related to that agency's 'internal rules and practices . . .'"  <u>Larson v. Dep't of State</u>, No. 02-1937, 2005 U.S. Dist. LEXIS 35713, at *11 (D.D.C. Aug. 10, 2006).

DHS is relying on Exemption 2 here to protect categorically records it has described as "created in the course of conducting additional background checks and other security-related activities regarding certain visitors, who are chosen by the Secret Service based on certain details in their backgrounds and/or the circumstances of their visits."  2d Morrissey Decl. at ¶ 3.  This vague reference to "other security-related activities" does not come close to establishing that the withheld material in its entirety relates predominantly to internal Secret Service rules and

procedures.  Such a claim is facially suspect in any case, given that these records are created as

part of the Secret Service's fulfillment of its statutory responsibility to protect the president and

others,[26] a responsibility that is not predominantly an internal administrative matter related to

internal rules or procedures.

Mr. Ulmer's supporting declaration is equally vague and deficient.  For example, he

describes the sensitive security records as being encompassed in part in "an electronic table

[that] was being populated," Ulmer Decl. at ¶ 11, a description that is virtually nonsensical and is

not aided by his subsequent description of the table as containing "potentially responsive

records."  Id. at ¶ 12.

Nor has DHS met its burden of demonstrating that disclosure of all of the specific

information in these records would cause the kind of harm protected by Exemption 2.  Although

DHS characterizes the records as "designed to 'alert' defendant to potential security threats and

to 'most closely scrutinize'" certain White House Complex visitors, D's Mem. at 14, it has not

demonstrated how revealing, for example, the names of those visitors or who within the White

House requested visitor clearance, appointment dates and times as well as the dates and times the

clearance requests were made and who the appointment is with -- all information included within

the sensitive security records[27] -- could result potentially in the harm Exemption 2 is intended to

protect against.

Although DHS admits that "disclosing the names of persons whose visits have prompted

---

[26] See, e.g., Ulmer Decl. at ¶ 10 (acknowledging sensitive security records were created in connection with the agency's statutory responsibilities under 18 U.S.C. §§ 3056 and 3056A).

[27] See Ulmer Decl. at ¶ 16.

defendant to undertake additional security activities would not, alone, expose the nature of defendant's protective activities," D's Mem. at 14, it suggests that disclosure could allow a person with knowledge of the people and "facts" "to 'deduce' the nature of those additional protective activities." Id. This highly speculative and exceedingly non-specific claim cannot withstand scrutiny. It is simply not enough for a withholding agency to merely parrot the language and standards of the exemption as DHS has done here. See King, 830 F.2d at 219.

The supporting declarations do not fill in what DHS's lawyers have left out. Mr. Ulmer states that the name of the visitor and the intended visitee must be withheld "as such details may indicate certain security related activity, or the lack thereof." Ulmer Decl. at ¶ 22. But the mere fact of "security-related activity" has already been acknowledged by the Secret Service; the record to date makes it clear that for every White House visitor the Secret Service takes some kind of security-related actions. What is missing here is any explanation of how revealing the visitors' names, with whom they had appointments, the dates and times of those appointments and when the requests for appointments were made would reveal some more specific security-related action which, if disclosed, could circumvent the Secret Service's protective actions. Similarly, DHS has not met its burden of "specifically identifying"[28] how all of the specific information in the sensitive security records "'could be used to gain insight into the methods and criteria the Secret Service utilizes . . .'" D's Mem. at 14 (citations omitted).

This case stands in stark contrast to the cases cited by defendant, where Exemption 2 was held properly invoked to protect against specific types of information the disclosure of which demonstrably could lead to harm. For example, as discussed *supra*, Brunetti involved specific

---

[28] King, 830 F.2d at 219.

informant and file numbers, the disclosure of which could reveal source names.  357 F.Supp.2d

at 104.  Dorsett v. U.S. Dep't of the Treasury, 307 F.Supp.2d 28 (D.D.C. 2004) (cited at D's

Mem. p. 13) involved "an internal investigation document used by the Secret Service to analyze

and profile factual information concerning individuals who have come to the attention of the

Secret Service as having a direction of interest toward a Secret Service protectee and/or as a

possible potential threat toward a Secret Service protectee." Id. at 36.  In a subsequently

submitted declaration, the agency explained that the "profile sheet pertains solely to a third

party," and "contains internal threat assessments, observations, opinions, and evaluations."

Declaration of Kathy J. Lyerly, April 12, 2004 (attached as Exhibit 1).  Here, by contrast, DHS's

declarant has stated only that the information in the sensitive security records "was compiled for

law enforcement purposes."  Ulmer Decl. at ¶ 22.  This is patently insufficient.

## C.  Exemption 7(E) Does Not Provide Categorical Protection For Sensitive Security Records.

DHS also argues that all of the sensitive security information is entitled to categorical

protection by Exemption 7(E) of the FOIA.  Exemption 7(E) protects law enforcement

information the disclosure of which

> would disclose techniques and procedures for law enforcement
> investigations or prosecutions, or would disclose guidelines
> for law enforcement investigations or prosecutions if such
> disclosure could reasonably be expected to risk circumvention
> of the law.

5 U.S.C. § 552(b)(7)(E).

In addition, according to DHS, Exemption 7(E) offers "'categorical protection to

information related to law enforcement techniques,'"  D's Mem. at 15, *quoting* Smith v. Bureau

24

of Alcohol, Tobacco and Firearms, 977 F.Supp. 496, 501 (D.D.C. 1997).  This is a shockingly

misleading statement of what the court recognized in Smith v. BATF.  Immediately following

the language quoted by DHS, the court in Smith stated further:

> *In some cases*, it is not possible to describe secret law enforce-
> ment techniques, even in general terms, without disclosing the
> very information to be withheld . . . Still, that does not excuse
> the agency from providing the Court with information sufficient
> for it to decide whether the material is properly withheld under
> Exemption 7(D).

Id. (emphasis added).  Indeed, in that case the court went on to hold that the agency's

descriptions of what it had withheld under Exemption 7(E) were "too conclusory for this Court

to determine whether the exemption was properly invoked."  Id.  Missing was "greater detail as

to why the release of the information . . . would compromise law enforcement by revealing

information about investigatory techniques that are not widely known to the general public."  Id.

Here, too, DHS has not provided the requisite explanation of why releasing information

such as the names of White House visitors, the dates clearance for their visits was requested, the

dates of their visits and who they visited would reveal "investigatory techniques that are not

widely known to the general public."  For example, simply revealing that Mr. Abramoff had a

private meeting with President Bush on a date certain would say nothing about specific

techniques and procedures used by the Secret Service that is not already widely known to the

general public, given that the Secret Service has already acknowledged publicly that it conducts

investigations of potential White House visitors.  Compare Boyd v. Bureau of Alcohol, Tobacco

and Firearms, Civil No. 05-1096 (RMU), 2006 U.S. Dist. LEXIS 71857, at *8 (D.D.C. Sept. 29,

2006) (summary judgment denied as to Exemption 7(E) where agency offered "practically no

description of the material withheld," failed to explain "why the release of the information would compromise law enforcement by, for example, revealing investigatory techniques that are not widely known to the general public" and offered instead non-specific descriptions such as "techniques involving consensual monitoring.").[29]

Mr. Ulmer's claim that revealing the name of the visitor and who he or she was visiting "could suggest when additional security checks are conducted and when certain security measures are not, or are unlikely, to be taken," Ulmer Decl. at ¶ 22, is inherently implausible. This risk is posed only if the agency also discloses the criteria for using these additional security checks, information that the agency may properly withhold[30] and that CREW is not seeking in any event.  Standing alone, the names of individual White House visitors and who they visited reveal nothing not already widely known about Secret Service security measures.

### D.  Exemption 7(F) Does Not Provide Categorical Protection For Sensitive Security Records.

Defendant also seeks to shield the entire category of sensitive security records from public view on the ground that their disclosure "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  Charitably speaking, this is

---

[29] Given this holding and the court's subsequent holding on the government's renewed motion that the supporting declarations still failed to "offer a meaningful explanation of the agency's decision to withhold information pertaining to law enforcement techniques . . .," 496 F.Supp.2d 167, 174, DHS's citation to Boyd for the proposition that an agency may properly under Exemption 7(E) describe only "the general nature of the technique while withholding the full details," D's Mem. at 16, is curious at best and misleading at worst.

[30] These criteria are more appropriately compared to "information concerning personal characteristics used by the Secret Service in evaluating the dangerousness of a subject," that the court in Schwarz v. U.S. Dep't of Treasury, 131 F.Supp.2d 142, 150 (D.D.C. 2000), found properly within Exemption 7(E), a case that DHS cites as support for withholding the sensitive security information in its entirety.  See D's Mem. at 18.

the biggest stretch of all.

Whatever the merits in DHS's assertion that disclosing whether various security checks and measures are taken could permit evasion of those checks, Ulmer Decl. at ¶ 24, DHS has not demonstrated how revealing the names of the visitors, when clearance for their visit was made and who they visited could raise these same concerns.  As to the visitors themselves, they clearly know the circumstances of their visit and there is no suggestion in any of the agency's declarations that those visitors are precluded from publicly disclosing that information.

Moreover, DHS has not explained why the sensitive security information is different from the vast amount of information the agency has already disclosed about how it performs its protective function and that could similarly be used "to attempt to avoid certain security checks . . ." Ulmer Decl. at ¶ 24.  For example, the Third Declaration of Paul S. Morrissey, submitted in CREW v. DHS II (Document 29-2), provides a great deal of specific information about how the agency conducts background checks of potential White House visitors, see 3d Morrissey Decl. at ¶¶ 1-18 (attached as Exhibit 2), which presumably could be used just as readily to avoid the agency's security efforts.  DHS's blanket invocation of Exemption 7(E), without more, does not meet its burden of proving why *all* of the information in the sensitive security records is exempt from disclosure.

### III.  DHS HAS NOT JUSTIFIED WITHHOLDING FROM SENSITIVE SECURITY RECORDS THE NAMES OF INDIVIDUALS REQUESTING THAT VISITORS BE GIVEN ACCESS.

In a footnote at the close of its brief, DHS states that pursuant to Exemptions 6 and 7(C) it "would withhold" from sensitive security records the names of the individuals who requested access for visitors, Social Security numbers and dates of birth for the visitors and the name of an

access control officer, citing in support the Ulmer Declaration.  D's Mem. at 20 n.14.  No

justification whatsoever is offered for withholding the names of the individuals requesting that

visitors be given access.  As to the other categories of enumerated material, CREW does not

contest their withholding.

DHS, however, has offered no basis whatsoever for withholding the identities of

individuals requesting that visitors be given access.  The Ulmer Declaration is silent on any

privacy interest with respect to this information except as it relates to a Secret Service officer

and access control officer.  Ulmer Decl. at ¶ 30.[31]  To the extent that the identities of individuals

requesting visitor access also include White House officials, they have no legitimate privacy

interest, given that they are conducting the American public's business in a federal space using

federal dollars.  Moreover, the WAVES records already released by DHS contain this

information.  See, e.g., Exhibit 2 to Plaintiff Judicial Watch's Opposition to Defendant's

"Supplemental" Motion for Summary Judgment (Document 41 in Judicial Watch v. U.S. Secret

Service).

To the extent DHS, at the bidding of the White House, is attempting to prevent the public

from learning just what top government officials are up to, this contravenes the very purpose of

the FOIA:  "to 'open[] up the workings of government to public scrutiny'" based on a "belief

that 'an informed electorate is vital to the proper operation of a democracy.'"  McGehee v. CIA,

697 F.2d 1095, 1109-09 (D.C. Cir. 1983) (citations omitted).  For all these reasons, DHS has not

---

[31] As to them Mr. Ulmer notes that "there would appear to be little public interest in such information" and its release "could invade the individuals' privacy . . ."  Ulmer Decl. at ¶ 30. While plaintiff questions the sufficiency of this justification, it is not seeking the identities of these individuals to the extent they are as described, i.e., a Secret Service officer and access control officer.

justified withholding from sensitive security records the names of individuals requesting that visitors be given access.

## **CONCLUSION**

For the foregoing reasons, defendant's supplemental motion for summary judgment should be denied.  Alternatively, the Court should review all the withheld documents *in camera* to determine whether the records, or any portions thereof, should be withheld.

Respectfully submitted,

 /s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated:  January 10, 2008