# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                            |     |                                |
| ------------------------------------------ | --- | ------------------------------ |
| MICHAEL L. DORSETT,                        | )   |                                |
|                                            | )   |                                |
| Plaintiff,                                 | )   | Civil Action No. 00-1730 (TPJ) |
|                                            | )   |                                |
| v.                                         | )   |                                |
|                                            | )   |                                |
| UNITED STATES DEPARTMENT OF                | )   |                                |
| THE TREASURY, UNITED STATES                | )   |                                |
| SECRET SERVICE,                            | )   |                                |
|                                            | )   |                                |
| Defendant.                                 | )   |                                |

### DECLARATION Of KATHY J. LYERLY
### SPECIAL AGENT IN CHARGE, CAPITOL HILL
### AND INTERAGENCY LIAISON DIVISION AND
### FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
### UNITED STATES SECRET SERVICE

1. I am the Special Agent in Charge of the Capitol Hill and Interagency Liaison Division
and Freedom of Information and Privacy Acts (FOI/PA) Officer, United States Secret Service
(hereinafter Secret Service), Department of Homeland Security (DHS). I reported to my current
position as the Secret Service FOI/PA Officer on December 27, 2003, and have been employed
with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2. I am filing this declaration to address the concerns of this court, as outlined in its
Order dated March 10, 2004, regarding the Secret Service's segregability explanation in earlier
filings in this case.

3. I have conducted a review of each page of material that was withheld
in full from release to the plaintiff.



DEFENDANT'S
EXHIBIT

00CV1730(RBW)

Case 1:06-cv-00310-RCL    Document 47-2    Filed 01/10/2008    Page 3 of 23
APR  Case 1:00-cv-02730-RBW.  Document 42-2    Filed 04/13/2004    Page 2 of 3
SECRET SERVICE                                    (202)  406-9685                    P.3

4. The Secret Service withheld in their entirety a total of fourteen pages of material.

5. These fourteen pages are found in: Document no. 7, a one page document, Document 36, a seven page document, four pages of Document 32 (pages 3 thru 6), and two pages of Document 38 (pages 3 and 4).

6. After carefully evaluating the material on each of the withheld pages, I have determined that none of the withheld pages contain releaseable information which could be segregated from the nonreleasable portions.

7. Document 7 simply contains three pictures of third parties with no additional material on the page.

8. Pages 3 thru 6 of Document 32 and pages 3 and 4 of Document 38 relate solely to third party interviews and these pages contain no mention of plaintiff and no releaseable material.

9. Document 36 is a Secret Service profile sheet that pertains solely to a third party. Further, this document when taken in total, is used by the Secret Service to analyze and profile factual information concerning individuals who have come to the attention of the Secret Service and contains internal threat assessments, observations, opinions, and evaluations. Releaseable information can not be segregated from this document without revealing the methods and focus of the Secret Service's protective investigation network that is not widely known to the public and potentially benefiting those attempting to violate the law and avoid detection by the Secret Service.

5. In conclusion, after evaluating each of the fourteen pages of material withheld in full from the plaintiff, I have determined that no releaseable material can be reasonably segregated from these pages.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

statements are true and correct to the best of my knowledge and belief.

4-12-04
_____
Date

*Kathy J. Lyerly*

Kathy J. Lyerly
Special Agent in Charge,
Capitol Hill and Interagency Liaison
Division and Freedom of Information and
Privacy Acts Officer

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 1:06-cv-01912-JGP |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**THIRD DECLARATION OF PAUL S. MORRISSEY**
**DEPUTY ASSISTANT DIRECTOR**
**UNITED STATES SECRET SERVICE**

I, Paul S. Morrissey, hereby declare as follows:

1.      I am the Deputy Assistant Director of the Office of Protective Operations for the

United States Secret Service ("Secret Service"), which is a component of the Department of

Homeland Security ("DHS"). I have held this position since September 2006, and have been a

special agent with the Secret Service since January 1983. The statements made herein are based

on my personal knowledge or on information made available to me in my official capacity.

2.      This declaration supplements my prior declarations in this case, which were

executed on February 21 and March 5, 2007.

**Functions of the Secret Service**

3.      The Secret Service is a protective and law enforcement agency operating under

the provisions of Title 18 of the United States Code, Sections 3056 and 3056A. Pursuant to

Section 3056, the Secret Service is charged with the protection of the President and Vice

President of the United States and their immediate families; major candidates for President and

Vice President of the United States and their spouses; the President-elect and Vice President-

elect and their immediate families; former Presidents of the United States, their spouses, and

minor children; visiting foreign heads of state and heads of government; and certain other

individuals as directed by the President of the United States. By statute, the Secret Service's

protection of the President and Vice President (as well as the President-elect and Vice President-

elect) is mandatory. Additionally, the Secret Service is authorized to provide security for the

White House Complex and the Vice President's official residence; foreign diplomatic missions in

the Washington, D.C., area, and certain other locations within the United States; designated

events of national significance; as well as other locations.

     4.     The Office of Protective Operations ("OPO") is one of eight directorates in the

Secret Service that manage various operational and support functions. The OPO is responsible

for establishing policies related to the Secret Service's protective mission and for overseeing the

operational divisions that protect the persons, places, and events that the Secret Service is

authorized to protect. In my capacity as the Deputy Assistant Director of the OPO, the represen-

tations made in this declaration are made on behalf of the Secret Service as an agency and not

solely on behalf of the OPO.

     5.     The "White House Complex" (also "Complex"), as secured by the Secret Service,

includes the White House; the Eisenhower Executive Office Building ("EEOB"), which is also

known as the "Old Executive Office Building"; the grounds encompassing the EEOB and the

White House; and the New Executive Office Building ("NEOB"). Housed in the White House,

the EEOB and the NEOB are the offices of various staff of the Executive Office of the President

("EOP"), as well as offices for the staff of the Office of the Vice President ("OVP") including the

Executive Branch office of the Vice President himself. The secured area of the White House

Complex also includes all of the office space used by the OVP in the White House Complex.

6.    The Vice President's Residence ("VPR") is located at One Observatory Circle,

Washington, D.C., on the grounds of the United States Naval Observatory. The Secret Service

provides security for the Vice President at the VPR.

7.    As part of its function to provide security for the White House Complex and the

VPR, the Secret Service monitors and controls access to both locations.

### Records Regarding the White House Complex

A.    **Record Types**

8.    There are two interrelated electronic systems – collectively termed the White

House Access Control System ("WHACS") – for controlling and monitoring access to the White

House Complex: the Worker and Visitor Entrance System ("WAVES") and the Access Control

Records System ("ACR").

9.    The process for entry of a proposed worker or visitor into the White House

Complex begins when an authorized White House pass holder (including, but not limited to,

members of the President's and Vice President's staffs) advises the Secret Service that the

entrance of a particular individual, or group of individuals, is anticipated for a particular date.

10.    At that time, the authorized pass holder provides the Secret Service with

information such as the proposed visitor's identifying information (name, date of birth, and

Social Security number), the time and location of the planned visit, the name of the official or

employee submitting the request, the name of the person to be visited, the date of the request, and

3

the type of visitor – that is, worker, member of the press, individual with an appointment, or individual on an access list (such as a volunteer, courier, or "awaiting pass" staff member).

11.     Usually, this information is provided to the Secret Service electronically, when an authorized pass holder enters the information into a computer terminal connected to the White House Appointment Request Server, which automatically transmits it to the WAVES Center, where a Secret Service employee verifies that the requestor is authorized to make appointments for the specific location requested, and fills in any additional information that may be necessary, such as for a background check, then transmits the information electronically to the WHACS server. Authorized pass holders may also provide visitor information to the Secret Service in other ways, such as by telephone, facsimile, e-mail, or by dropping off a list, in which case Secret Service personnel may enter the information manually. Therefore, WAVES records regarding workers and visitors to the White House Complex consist primarily of information that an authorized White House pass holder has provided to the Secret Service.

12.     The Secret Service uses the information provided to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the Complex and to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13.     WAVES records contain various fields, two of which, the note field and the comment field, may be annotated by Secret Service personnel with limited information from background checks performed by the Secret Service and instructions including coded instructions to Secret Service officers. The note field and the comment field may contain security information, and may occasionally note under what circumstances a visitor is to be admitted.

4

The comment field may also occasionally note that a person is being admitted for a holiday party, departure photo, or some other large group function.

14.    Upon arrival, a visitor to the Complex is generally issued an appropriate pass (although passes are often not issued for large groups).   ACR records are generated when a pass holder, worker, visitor, or Secret Service officer on an individual's behalf swipes his or her pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.  ACR records include information such as the entrant's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded.  ACR records do not include information about who the entrant (pass holder, worker, or visitor) is visiting on the Complex, or who requested the visitor's entrance.

15.    Once a visit takes place, WAVES records are typically updated electronically with information showing the time and place of the visitor's entry into and exit from the White House Complex.  This information is ACR information, although the time of arrival may differ slightly between the WAVES and ACR records.  The after-visit records are commonly referred to as WHACS records.

16.    Apart from the above-described records, the Secret Service itself sometimes creates and/or uses certain records, known as Secret Service Form ("SSF") 1888s, as part of the background investigation process to determine whether, and under what conditions, an individual should be admitted to the White House Complex. An SSF 1888 is created for (1) workers (that is, persons coming to the Complex in relation to a work order, such as to fix a broken copier), (2) visitors who the Secret Service determines, on the basis of a limited background check, have certain criminal histories or other information of protective interest, and for whom, therefore, a

5

decision is made to deny admittance altogether or to grant admittance only with an escort, and (3) individuals who were previously permitted access to the Complex but who the Executive Office of the President Security Office or the White House Military Office have subsequently requested be excluded from the Complex. There are also related paper files and work orders associated with SSF 1888 information. The Secret Service does not transfer this information to the WHORM or the OVP.

  17.  Beyond the SSF 1888s and related paper records, the Secret Service sometimes creates other records that relate to the background investigation and security process conducted in connection with certain individuals entering or scheduled to enter the White House Complex (hereinafter referred to as "Additional Security-Related Records"). These records are created in the course of conducting additional background checks and other security-related activities regarding certain visitors, who are chosen by the Secret Service based on certain details in their backgrounds and/or the circumstances of their visits. The records include the names and other identifying information concerning such visitors (including, in some cases, their birth dates and/or Social Security numbers) and background information on them or information regarding their visits to the Complex, which may include criminal history and/or other security-related information. Like the SSF 1888s and related paper records, the Secret Service does not transfer these records to the WHORM or the OVP. The persons whose visits to the White House are reflected in these records should also be reflected in WAVES records.

6

**B.      White House and OVP Control over White House Access
Records and the Maintenance of these Records**

18.      Once a visitor's visit to the White House Complex is complete, the Secret Service

has no continuing interest sufficient to justify preservation or retention of WAVES or ACR

records, and the Secret Service recognizes that such records are under the exclusive legal control

of the President and Vice President.  Since at least 2001, it has been the practice of the Secret

Service to transfer newly-generated WAVES records on CD-ROM to the White House Office of

Records Management ("WHORM") every 30 to 60 days.  Upon the turnover of a periodic batch

of WAVES records, a WHORM employee typically signs a form acknowledging receipt of the

records.  (A sample of that receipt form is attached hereto as Exhibit A.)  I have been advised that

prior to July 2006, the Secret Service was removing the note and comment fields from the

WAVES records before transferring the records to the WHORM.   It was the intent of the Secret

Service that, once transferred, the WAVES records were to be erased from its computer system.

Indeed, I have been informed that the WAVES records on the servers, older than 60 days, are

purged daily and overwritten on the servers.

19.      I have been further advised that in November 2004 (beginning with October 2004

records), because of a request from the National Archives and Records Administration, the Secret

Service began temporarily retaining a copy or copies of the WAVES records that it transferred to

the WHORM.  The retained Secret Service copies included the note and comment fields that

were not being provided to the WHORM.  In July 2006, the Secret Service ceased the practice of

removing the note and comment fields when transferring WAVES records to the WHORM, and

retroactively provided WAVES records to the WHORM that contained these fields for the period

7

from October 12, 2004, to July 10, 2006. From July 2006 forward, the Secret Service has

provided these fields to the WHORM when transferring WAVES records. The Secret Service

continues to retain one or more copies of transferred WAVES records, due to pending litigation

and FOIA requests.

  20.  Notwithstanding the above-described practice, the Secret Service discovered, in

the course of conducting a search pursuant to a Freedom of Information Act ("FOIA") request in

June 2006, that some WAVES data predating October 2004 remained on the hard drives of two

Secret Service computers located in the Information Technology Section of the Presidential

Protective Division. I am informed that the two computers are believed to contain multiple

database files of varying degrees of non-comprehensive WAVES data predating October 2004,

with gaps in the report periods. I am also informed of the belief that the validity of the data

cannot be assured, because some of the data appear to have been used for testing and

development, and that the data appear to exist in a separate location from the folder where the

WAVES CD-ROMS are made. The hard drives also contain post-October 2004 WAVES

records. The Secret Service continues to retain one or more copies of the WAVES data and

records found on the hard drives, due to pending litigation and FOIA requests.

  21.  In May 2006, the Secret Service Records Management Program entered into a

Memorandum of Understanding ("MOU") with the White House Office of Records Management

that both documented past practice regarding WAVES and ACR records, and confirmed the legal

status of those records and of WHORM's management and custody of them under the Presiden-

tial Records Act. A true and correct copy of the MOU is attached hereto as Exhibit B.

22.     At least as early as 2001 (at the end of the Clinton Administration), and upon

revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that

ACR records should be treated in a manner generally consistent with the treatment of WAVES

records.  The White House and the Secret Service have determined that ACR records should be

transferred to the WHORM and deleted from the Secret Service's computers like WAVES

records.  In May 2006, the Secret Service transferred to the WHORM the ACR records covering

the period from 12:00 p.m. on January 20, 2001, to April 30, 2006.  (The Secret Service has also

transferred, to the National Archives and Records Administration, the ACR records covering the

period from 12:00 p.m. on January 20, 1993, to 12:00 p.m. on January 20, 2001.)  However, the

Secret Service continued to retain one or more copies of the ACR records due to pending

litigation and FOIA requests.  Since the time of these transfers, the Secret Service has continued

to transfer ACR records to the WHORM, but continues to retain one or more copies of ACR

records, due to pending litigation and FOIA requests.  The Secret Service also continues to retain

one or more copies of pre-January 20, 2001, ACR records, due to pending litigation and FOIA

requests.

23.     I have been advised that WAVES and ACR records were released in Judicial

Watch v. United States Secret Service, 06-CV-310 (D.D.C.); Democratic National Committee v.

United States Secret Service, 06-CV-842 (D.D.C.); and Citizens for Responsibility and Ethics in

Washington v. Department of Homeland Security, 06-CV-883 (D.D.C.).  I understand that these

releases were made only after the Office of the President and the Office of the Vice President, in

the exercise of discretion, expressly authorized these releases.

24.    In addition, the Secret Service has been transferring to the WHORM certain paper records regarding workers and visitors for some time, typically every 30 to 60 days.  In general, these paper records consist of certain types of requests for access to the White House Complex that have been entered into WAVES, such as large event lists, facsimiles, and e-mails.  The Secret Service also has certain other lists and checklists relating to large group appointments dating back to October 2006, which have now been transferred to the WHORM and will be transferred going forward on the same 30- to 60-day schedule.  As with WAVES and ACR records, once a visitor's visit to the Complex is complete, the Secret Service has no continuing interest in these materials sufficient to justify their preservation or retention.   The Secret Service began retaining these materials, or copies of these materials, in the fall of 2006, due to pending litigation and FOIA requests.[1]

25.    In addition, at the end of each day, WAVES Center personnel typically send a copy of the President's scheduled appointments for that particular day to his diarist.

_____

[1] I have been advised that, in the course of an office move at the White House Complex, the Secret Service discovered a number of paper access requests and other paper records regarding visitors and workers, covering the period from March 2001 through October 2001, in an unexpected location.  The Secret Service has now transferred those records to the WHORM, but retained a copy due to pending litigation and FOIA requests.  Also, I am advised that, in the course of preparing information for this declaration, the Secret Service discovered electronic versions of certain visitor records on the appointment/visitor system.  These records were being created automatically by software that was copying visitor data submitted by authorized White House pass holders and dumping the data into a spreadsheet format.  This set of records, dating back to September 2006, consists of information submitted to the White House Appointment Request Server by authorized White House pass holders, along with alphanumeric identifiers used only within the system.  This set of records exists only in electronic format (that is, they have not generally been printed).  The Secret Service has now transferred this set of records to the WHORM, but retained a copy due to pending litigation and FOIA requests.

10

26.    I am advised that the White House Office and the Office of the Vice President have approved the above-described retention of records by the Secret Service, though expressly without prejudice to the control of the subject records by the President and the Vice President under the Presidential Records Act.

**C.    FOIA Request and Search**

27.    I am advised that the Secret Service has received a FOIA request for records relating to any visit to the White House, from January 1, 2001, to the present, by James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon, or Jerry Falwell. In regard to the FOIA request and pursuant to instructions, the OPO has searched the SSF 1888s for information concerning the above-listed individuals. This search included the period of January 1, 2001, until January 25, 2007. This search produced no information concerning the named individuals. It therefore was unnecessary to search the paper documents related to the 1888s.

28.    I am informed that the subject FOIA request defines "White House" as including "any office within the Executive Office of the President, the residence of the President, the Old and New Executive Office Buildings, and any other office or space on the grounds of the White House." In regard to the definition, I note that some EOP offices exist outside the White House Complex, but the Secret Service does not maintain or operate access systems at those sites.

29.    The Secret Service has also searched the Additional Security-Related Records described above for information concerning the individuals listed in the subject FOIA request. This search produced nineteen pages of records that include the names of some of those individuals, and those pages were reviewed for possible release under the FOIA. The handling of

11

these records in relation to the subject FOIA request is further addressed in the "Declaration of Kathy J. Lyerly" submitted in this case.

30.    Apart from the above-described records of visitors, the Secret Service has records of public, self-guided tours of the White House that do not involve visiting any Presidential or Vice Presidential personnel. As of June 2006, approximately 48,400 persons participate in these tours each month. As a security measure, the Secret Service takes the names and other identifying information of persons who participate in such tours, but these records were not uniformly retained until early 2007. The Secret Service does not understand the subject FOIA request as applying to records of such tours.

<strong>Records Regarding the Vice President's Residence</strong>

**A.    Record Types**

31.    The WAVES and ACR systems are not used at the VPR.

32.    The Secret Service monitors and controls access to the VPR through the use of two access lists – a daily access list for individuals with appointments or work orders, and a permanent access list for individuals who regularly enter the facility, including staff members of the Office of the Vice President, military personnel, contractors, service workers, and members of the Vice President's family. The Secret Service receives requests from the Vice President's staff or from authorized military personnel to screen individuals for entry. The Secret Service conducts background checks on individuals for whom there has been a request for admission (using personal identifiers provided by the requester, including name, date of birth, and Social Security number), and, if there is no information of protective interest, the name is then placed on the permanent access list or daily access list.

12

33.     Both the permanent access list and the daily access list are provided to Secret
Service officers at entrances to the VPR's grounds and reflect that the individual requested for
entry has been screened by the Secret Service. The names of individuals who enter on a particu-
lar day, along with the time and date, are handwritten on an entry log by the officer working at
the gate where the individual arrives. The post entry logs exist only on paper. The post entry log
is the ultimate record created from the initial request for entry.

34.     In addition to the permanent access lists, daily access lists, and post entry logs, the
Secret Service, in controlling access to the VPR, uses (1) an electronic database containing infor-
mation regarding individuals seeking access, which is used for generating both the permanent
and daily access lists; (2) requests for access, from OVP staff, military and Secret Service
personnel, received primarily by e-mail and occasionally by facsimile or other means; and
(3) lists from the OVP of invited guests and workers for special events.

35.     Apart from the above-described records regarding visitors to the VPR, the Secret
Service itself creates and uses certain records known as "hit" reports as part of the background
investigation process to determine whether, and under what conditions, an individual should be
admitted to the VPR. These records are created when an individual's background check returns
information of protective interest or criminal history information. The Secret Service Uniformed
Division officer completing the background check creates a cover memorandum regarding the
results as well as a determination regarding whether, and under what conditions, the individual is
to be given access to the VPR. This memorandum is attached to the background check results
and filed as a "hit" report.

36.    Also apart from "hit" reports, the Secret Service officer commanding each shift at the VPR creates a Watch Commander Journal to record security-related incidents as well as the arrivals and departures of the Vice President and Mrs. Cheney, and, in some instances, other visitors to the residence. The Watch Commander Journals are created to provide situational awareness for watch commanders between shifts and to provide a means for them to apprise themselves of what went on at the residence in their absence. Supervisors occasionally refer back to them to review the activities/incidents occurring at the VPR in order to make staffing level assessments. The Watch Commander Journals are created and used in electronic format, separately from the records described in the preceding paragraphs.

**B.**    **OVP Control over VPR Records and the Maintenance of these Records**

37.    Once a visitor's visit to the Vice President's Residence is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of records of such visitors — other than materials containing information of protective interest to the Secret Service, such as records resulting from background checks and the Watch Commander Journals — and the Secret Service recognizes that such records (with the exception noted) are under the exclusive legal control of the Vice President. Since 2001, the Secret Service's consistent practice has been to transfer to the OVP, generally on a monthly basis (dating back to January 2001), all handwritten post entry logs from the VPR. After an individual's visit to the VPR, the Secret Service has no continuing interest sufficient to justify preservation or retention of the post entry logs. Once each periodic batch of post entry logs is received, an OVP employee typically signs a

form acknowledging receipt of the records.  (A sample of that receipt form is attached hereto as Exhibit C.)

38.    In June 2006, the Secret Service Special Agent in Charge, Liaison Division, who is also the agency's Freedom of Information and Privacy Acts Officer ("FOI/PA Officer"), directed that records concerning access to the VPR be retained.   The Secret Service then began retaining a copy of each post entry log that it transfers to the OVP, pending a judicial determination of their legal status.

39.    It has been the practice of the Secret Service to update the access list database as changes are made in persons who are authorized for permanent access, to dispose of printed daily access lists on a daily basis, to dispose of printed permanent access lists as changes are made in persons authorized for permanent access, and to purge the access list database each day of information reflecting persons from the daily access list who have not been authorized to enter the VPR for over thirty days.  Once an individual's visit to the VPR is over, the Secret Service has no continuing interest sufficient to justify preservation or retention of these records.  As stated above, however, the Secret Service Special Agent in Charge, Liaison Division, directed in June 2006 that records concerning access to the VPR be retained, and the Secret Service began retaining permanent access lists and daily access lists, and has ceased purging information from the access list database.[2]  The Secret Service has now transferred to the OVP all existing

---

[2] In the course of conducting a search for records potentially responsive to a different FOIA request, the Secret Service discovered some paper copies of daily access lists, as well as requests for access, a number of which pre-date the June 2006 direction from the FOI/PA Officer, in places where such documents are not normally stored.  These records are from sporadic dates and are not comprehensive.  The retention of these documents was not in accordance with the normal practice at the VPR.  In accordance with the FOI/PA Officer's direction, these documents have

(continued...)

permanent access lists and daily access lists from the VPR back to July 2006 (along with some

earlier, non-comprehensive lists, back to August 2005, that had not been discarded), and will

continue to transfer permanent and daily access lists on a monthly basis in connection with the

transfer of post entry logs.  The Secret Service has also transferred to the OVP an electronic copy

of the access list database with data retained from on or about June 27, 2006, and will continue to

transfer such electronic copies on a monthly basis.  The Secret Service has, however, retained

copies of these lists and database versions due to pending litigation and FOIA requests.

     40.     The Secret Service's practice with respect to e-mails requesting access to the VPR

has been to print out the requests and then to destroy them after 15 to 30 days.  Access requests

received by other means, such as by facsimile, have historically been destroyed at the same time.

As with the daily access lists, the permanent access lists, and the post entry logs, the Secret

Service has no continuing interest sufficient to justify preservation or retention of these records

after an individual's visit is over.   However, the FOI/PA Officer directed, in June 2006, that all

such materials be retained, and they have been retained.  E-mails dating back to April 2006 exist

in electronic form on a computer hard drive.  The Secret Service has now transferred to the OVP

all existing electronic and paper requests for access from the VPR back to April 2006 (along with

some earlier, non-comprehensive paper requests, back to June 2002, that had not been discarded),

and will continue to transfer such records on a monthly basis in connection with the transfer of

post entry logs.  The Secret Service has, however, retained copies of these records due to pending

litigation and FOIA requests.

---

    [2](...continued)
been retained.

41.    The Secret Service also uses event lists for controlling access to the VPR during a particular event.  These lists contain information such as the names of invited guests and workers, their companies, forms of entry, instructions to Secret Service officers at point of arrival and at other officer posts, and event arrangements, parking and arrival schedules.  After the event has concluded, the Secret Service has no continuing interest sufficient to justify preservation or retention of the event lists.  Until June 2006, event lists were not consistently retained.  However, after receipt of the FOI/PA Officer's direction in June 2006, such records are being retained.  The Secret Service has now transferred to the OVP all existing event lists from the VPR back to June 2006 (along with some earlier, non-comprehensive event lists, back to February 2005, that had not been discarded), and will continue to transfer event lists on a monthly basis in connection with the transfer of post entry logs.  The Secret Service has, however, retained copies of these lists due to pending litigation and FOIA requests.

42.    The handling of entry records relating to the Vice President's Residence was addressed in a September 13, 2006, letter from Shannen W. Coffin, Counsel to the Vice President, to Donald Personette, Chief Counsel to the Secret Service (copy attached hereto as Exhibit D).

43.    Watch Commander Journals and those records created by the Secret Service in connection with its background investigations of those seeking access to the VPR have not been turned over to the WHORM or the OVP.

44.    I am advised that the OVP has approved the above-described retention of records by the Secret Service, though expressly without prejudice to the control of the subject records by the Vice President under the Presidential Records Act.

17

C.    **FOIA Request and Search**

45.    I am advised that the Secret Service has received a FOIA request for records

relating to any visit to the VPR, from January 1, 2001, to the present, by James Dobson, Gary L.

Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald

Wildmon, or Jerry Falwell.  Pursuant to instructions, the OPO has searched "hit" reports.  This

search was for the period of January 1, 2001, until January 25, 2007, and produced no informa-

tion concerning the named individuals (although not all hit reports that were created during this

period still exist).  Also pursuant to instructions, Watch Commander Journals were searched for

the period of October 1, 2004, until January 25, 2007.  (Watch Commander Journals predating

October 1, 2004, no longer exist.)  This search produced no information concerning the named

individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23rd, 2007.

PAUL S. MORRISSEY

18