# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES SECRET SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | Civil Action No. 06-310 (RCL) |
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY IN SUPPORT OF SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The Court should enter summary judgment in favor of the Department of Homeland

Security ("DHS")[1] on Citizens for Responsibility and Ethics in Washington's ("CREW's")

Freedom of Information Act ("FOIA") claims, as DHS has conducted a reasonable search and

released all non-exempt, responsive records located in the course of that search.  Memorandum

---

[1] DHS has acted through its agency component, the United States Secret Service ("Secret Service"), during this case.  Hence, "DHS" and "Secret Service" are used interchangeably in this memorandum.

in Support of Supplemental Motion for Summary Judgment on Claims I-III, December 11, 2007

("Opening Memo."), at 7-20.

CREW disputes DHS's entitlement to summary judgment.  Plaintiff [CREW's]

Opposition to Defendant's "Supplemental" Motion for Summary Judgment on Claims I-III,

January 10, 2008, Doc. No. 47 ("Opp.").  In its opposition, CREW mistakenly asserts that DHS

has (i) conducted an inadequate search, (ii) improperly invoked the Glomar doctrine to protect

Sensitive Security Records, and (iii) failed to justify withholding the Sensitive Security Records

pursuant to FOIA Exemptions 2, 7(E), and 7(F).  Id. at 9-29.

CREW's arguments fail.  First, DHS has conducted a reasonable search:  It has plumbed

all record categories that are reasonably likely to contain responsive records.  Indeed, after more

than 18 months of litigation, DHS has searched 15 categories of records and released over 350

pages of responsive records.[2]  Second, DHS has properly invoked the Glomar doctrine.

Confirming or denying the existence of Sensitive Security Records with respect to specific

individuals would provide insight into the circumstances in which the Secret Service undertakes

certain security procedures and, thus, would facilitate evasion of those procedures.  Glomar

relieves agencies of the duty to confirm or deny the existence of records in such a circumstance.

See Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976); 5 U.S.C. §§ 552(b)(2), (b)(7)(E).  Finally,

DHS has properly supported the invocation of Exemption 2, 7(E), and 7(F):  Releasing the

---

[2] Contrary to suggestion in its brief, Opp. at 6, CREW received the 350 pages of
responsive records that were released by DHS in September 2006.  While it is true that counsel
for DHS initially mailed these records to the address for CREW reflected on its FOIA request,
and from which CREW had moved, these records were sent to CREW by courier the day after
the error was identified.  Reply in Support of Defendant's Motion to Dismiss Plaintiff's FOIA
Claims, October 5, 2006 ("Reply in Support of Motion to Dismiss"), at 2-3.  Moreover, CREW
has previously acknowledged that it received these records.  Id.

records, or the parts of the record sought by CREW, would reveal law enforcement techniques (which are also matters of agency practice), and thereby facilitate the evasion of these techniques. Summary judgment is warranted.

## FACTUAL BACKGROUND

DHS has previously provided a detailed recitation of the relevant facts, Opening Memo. at 4-7, and it need not do so again here. In short, DHS has released over 350 pages of records responsive to CREW's FOIA request and has searched records in the following 15 categories:[3] records containing Worker and Visitor Entrance System ("WAVES") information,[4] records containing Access Control Record System ("ACR") information, Secret Service Form 1888 records, paper access requests and other documents related to the White House Complex from 2001, Sensitive Security Records, records reflecting parking requests or authorization to park at the White House Complex, electronically maintained e-mail messages at the WAVES Center requesting access to the White House Complex, White House Daily Briefing Sheets, First Lady

---

[3] The White House Office of Records Management ("WHORM") also has searched certain Large Event Summaries. Declaration of Craig W. Ulmer, Dec. 11, 2007 ("Ulmer Decl."), ¶ 7 (attached as Exhibit 2 to Opening Memo).

[4] For some period of time prior to May 26, 2006, certain fields contained in the three computer tables from which WAVES records appear to be constructed may not have been retained by the Secret Service for more than 60 days. See Fifth Declaration of Paul S. Morrissey, CREW v. DHS, Case No. 06-cv-1912 (D.D.C.) (RCL) ("CREW II"), January 24, 2008, ¶ 10 (attached to Doc. No. 50). Since May 26, 2006, the Secret Service has retained all of the fields in these tables, and it recently has begun to study this matter. Id. The Secret Service does not know if any relevant information exists. If there is any information in these fields, it should relate only to the single visit to the White House Complex between May 26, 2006 and the July 6, 2006 cut-off date that is reflected in WAVES records that have already been released to CREW – a visit by Shawn Vasell on June 25, 2006 for a large group function, the Ford's Theatre Gala Reception. At all events, with respect to this single visit, CREW has the information sought by its FOIA request, i.e., it knows who visited whom and when. See Opp. at 23, 28. Accordingly, this matter does not undercut the Secret Service's request for summary judgment.

Schedules,[5] the access database that generates the daily and permanent access lists at the Vice

President's Residence ("VPR"), post entry logs at the VPR, e-mails requesting access to the VPR

and paper copies of requests for admission to the VPR, special events lists at the VPR, Watch

Commander Journals, and VPR "hit reports."[6]  See Ulmer Decl. ¶¶ 5-6; Declaration of Paul S.

Morrissey, Dec. 12, 2006 ("Morrissey Decl."), ¶¶ 3-8 (attached to Notice of Filing Doc. No. 59

[Case No. 06-883]); Declaration of Kathy J. Lyerly, September 21, 2006 ("Lyerly Decl."), ¶¶ 7-

10 (attached to Doc. No. 45 [Case No. 06-883]).

## ARGUMENT

In its opening brief, DHS demonstrated its entitlement to summary judgment.  Opening

Memo. at 8-20.  A court should enter summary judgment on a FOIA claim when the defendant

agency has conducted a reasonable search and released all responsive, non-exempt records.  See

Master v. FBI, 926 F. Supp. 193, 195-96 (D.D.C. 1996).  DHS established that it has conducted a

reasonable search.  Opening Memo. at 8-9.  Also, DHS released two responsive Large Event

Summaries that it had recently located and properly justified the limited redactions made to these

summaries.[7]  Id. at 2, 19-20.  What is more, DHS properly invoked the Glomar doctrine,

---

[5]  DHS located these electronic schedules after it filed its opening memorandum in
support of the supplemental motion for summary judgment.  DHS, with the authorization of the
Office of the President ("OP"), searched the schedules but did not locate any responsive records.

[6]  In this case, and in the Judicial Watch case with which it has been consolidated, DHS
has searched and described those categories of records that were, at the time that the categories
were identified as being potentially responsive, reasonably likely to contain responsive records.

[7]  CREW contends that summary judgment as to the Large Event Summaries is
inappropriate because DHS has withheld "limited security information," Ulmer Decl. ¶ 33, from
these records, and has not "provide[d] any detail" about this information.  Opp. at 8 n.12.  This is
simply false.  CREW drew its quotation regarding "limited security information" from the
section of the Ulmer declaration addressing segregability.  Ulmer Decl. ¶ 33.  In that portion of

establishing that it could neither confirm nor deny whether responsive Sensitive Security Records

exist with respect to any particular individual names in plaintiff's FOIA request, as to do so

would undermine the Secret Service's ability to carry out its protective function. See 5 U.S.C. §§

552(b)(2), (b)(7)(E); Ulmer Dec. ¶ 22; Opening Memo. at 10-11. In conjunction with the fact

that DHS conducted a reasonable search and properly redacted the Large Event Summaries, the

Glomar doctrine dictates that the Court enter summary judgment in favor of DHS. See Frugone

v. CIA, 169 F.3d 772,774-775 (D.C. Cir. 1999); Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C.

Cir. 1990). Finally, in the alternative, even if the Glomar doctrine is inapplicable, DHS

established that the Sensitive Security Records are categorically exempt from disclosure pursuant

to FOIA Exemptions 2, 7(E) and 7(F), as to reveal the information contained within any

responsive Sensitive Security Records would reveal a law enforcement practice of the Secret

Service and impede its ability to discharge its protective function. Opening Memo. at 11-19.

These well-supported exemptions, when combined with DHS's reasonable search, also entitle

DHS to summary judgment. See Master, 926 F. Supp. at 195-96.

---

his declaration, the declarant used the shorthand "limited security information" for the security-related withholdings that he already had described in the declaration: "To protect the security of the White House Complex, the Secret Service redacted, in Large Event Summaries, under exemption (b)(2) in conjunction with exemption (b)(7)(E), limited information from background checks performed by the Secret Service and instructions including coded instructions to Secret Service officers, all of which was compiled for law enforcement purposes." Ulmer Dec. ¶ 23. What is more, DHS's opening brief describes the limited security information that the Secret Service withheld from the Large Event Summaries in the same manner, quoting from paragraph 23 of the Ulmer Declaration. Opening Memo. at 19-20. Contrary to CREW's assertion, then, DHS has provided enough information to make it possible for CREW and "the Court to ascertain whether this withholding is proper," Opp. at 8 n. 12, and as set forth in DHS's opening brief, the withholding is proper, Opening Memo. at 19-20.

CREW challenges both the reasonableness of DHS's search and its treatment of responsive records.  None of its arguments withstands scrutiny.

## I.     The Secret Service Conducted A Reasonable Search

DHS has conducted a reasonable search.  <u>See</u> Opening Memo. at 8-10.  CREW disagrees and makes four basic arguments with respect to the reasonableness of the search.  None has merit.

First, CREW argues that record transfers from DHS to the WHORM render DHS's search incomplete.  Opp. at 10-12.  CREW's initial argument in this regard is that DHS has not precisely explained when its longstanding practice of deleting WAVES records from its system and transferring them to the WHORM began, so there "is simply no way for the Court to determine whether the agency's failure to locate WAVES records for any period prior to October 2004 is reasonable."  Response at 11.

A fundamental flaw undoes this argument:  DHS has released to plaintiff scores of records containing WAVES data reflecting visits to the White House Complex prior to 2004.  Reply in Support of Motion to Dismiss at 8 n.5; Lyerly Decl. ¶¶ 3, 17, 31.  Thus, CREW cannot impugn the search by claiming that DHS has not adequately explained its failure to turn over any records containing WAVES data for the period prior to October 2004.  In addition, DHS has explained that any pre-2004 records containing WAVES data in its possession would likely be found on the hard drives of two computers in the Information Technology Section of the Presidential Protective Division of the Secret Service, and that these computers have been searched using qualified personnel and appropriate methods.  Reply in Support of Motion to Dismiss at 5-6.   This suffices to demonstrate that DHS conducted a reasonable search of these

records.  DHS need not pinpoint the start of the transfer policy in order to hypothesize what records should have been found in its possession when it has actually conducted a reasonable search of the location where those records are likely to be found.  The FOIA requires a reasonable search, not a scientifically precise hypothesis.

CREW forwards two other fruitless arguments related to document transfers.  These arguments are nearly identical:  Both stem from a declaration filed in CREW II, and both are refuted by the very declaration from which they spring.  Based on a declaration provided by Paul Morrissey in CREW II, Third Declaration of Paul S. Morrissey, 06-CV-1912, May 23, 2007 ("CREW II Morrissey Decl.") (attached to Doc. No. 29), CREW takes DHS to task for (i) transferring to the WHORM, in July 2006, WAVES records for the period from October 12, 2004 to July 12, 2006, Opp. at 11, and  (ii) transferring five years' worth of ACR records to the WHORM in May 2006 "notwithstanding CREW's pending FOIA request."  Response at 12. CREW concludes that Mr. Morrissey's recounting of these transfers demonstrates that DHS "has freely acknowledged destroying or otherwise disposing of potentially responsive documents after CREW filed its request."  Opp. at 11-12.  CREW thus implies that DHS transferred these records without searching them.

These arguments do not withstand scrutiny, for as the Morrissey Declaration itself explains, DHS retained copies of the records that it transferred.  In regard to the WAVES records, the declaration explains that "[t]he Secret Service continues to retain one or more copies of transferred WAVES records, due to pending litigation and FOIA requests."  CREW II Morrissey Decl. ¶ 19.  And as for the ACR records, the declaration notes that "[t]he Secret Service continued to retain one or more copies of the ACR records due to pending litigation and

7

FOIA requests." CREW II Morrissey Decl. ¶ 22.   What is more, in the September 2006 release of responsive records, CREW received numerous WAVES and ACR data/records dating to the periods covered by the respective transfers.[8]   CREW's arguments are therefore without merit.

CREW's second basic challenge to the search is that there is no reason for the Court to believe that DHS has conducted a reasonable search because DHS has previously said that it has found all responsive records, only to later discover more responsive records. Opp. at 12-13.

---

[8] In footnote 17 of its Response, CREW suggests (1) that DHS might have additional responsive WAVES records which have not been searched, namely, copies of WAVES records transferred to the WHORM before CREW filed its FOIA request, and (2) that the records transferred to the WHORM before CREW filed its FOIA request need to be searched.  Opp. at 12 n.17.  First, a clarification needs to be made with respect to the first point:  DHS possesses copies of some of the records transferred to the WHORM before plaintiff filed its request, and those responsive records that were located following a reasonable search were released to plaintiff. Reply in Support of Motion to Dismiss at 8 & n.5.  With respect to the merits of the first point, DHS has explained that a reasonable search indicates that to the extent the Secret Service kept copies of WAVES records transferred before the date of the request they would be located on certain CD-ROMs and the hard drives of two computers in the Information Technology Section of the Presidential Protective Division.  Lyerly Decl. ¶¶ 13, 16-17.  These storage locations have been searched and responsive records have been released.  Id. ¶¶ 13, 16-17, 31.  Nothing more is required.  As for point two, DHS has previously addressed this matter, and it hereby adopts those arguments by incorporation. Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's FOIA Claims, September 21, 2006, Doc. No. 45 in Case No. 06-CV-883 ("Memo. in Support of Motion to Dismiss"), at 8-12; Reply in Support of Motion to Dismiss at 8-11.  Stated in short, the argument on the merits with respect to point two is that the White House, and not DHS, controls the records transferred to the WHORM prior to the submission of CREW's FOIA request.  CREW's contention that settlement discussions indicate that DHS controls records transferred to the White House before CREW filed its FOIA request, because DHS has offered them to CREW in these discussions, Opp. at 6, 12 n.17, is unavailing.  First, settlement discussions are intended to be confidential and not disclosed to the trier of fact.  See, e.g., Local Rule 84.9(a) (barring disclosure of any written or oral communications arising in court-ordered mediation and prohibiting communication between the mediator and the assigned judge).  Second, even if an offer of such records were made, it would not demonstrate that DHS controls these records.  Rather, it would demonstrate simply that DHS could turn over records in the control of the OP and the Office of the Vice President ("OVP") if those offices agreed to allow it to do so.

CREW misapprehends an agency's responsibility under the FOIA.  The FOIA requires an agency to conduct a reasonable search; it does not require perfection.  <u>Meeropol v. Meese</u>, 790 F.2d 942, 956 (D.C. Cir. 1986).  Accordingly, that an agency finds additional responsive records after asserting that it has done all that FOIA requires does not establish that the agency had not, in fact, done all that FOIA requires.  <u>Id.</u> at 952-53.  "It would be unreasonable to expect even the most exhaustive search to uncover *every* responsive file."  <u>Id.</u> at 953 (emphasis in the original).  In its motion to dismiss, DHS argued that the case was moot because it had done all that FOIA requires, i.e., it had released all responsive, non-exempt records found after a reasonable search.  Memo. in Support of Motion to Dismiss at 6.  In light of the governing legal standard and DHS's prior representations to the Court, that DHS discovered responsive documents after it filed the motion to dismiss does not provide the Court with any reason to question DHS's credibility.  To the contrary, DHS's efforts to apprise the Court of newly discovered records evince DHS's good faith and burnish the integrity of the search: "[T]he additional releases suggest a stronger, rather than a weaker, basis for accepting the integrity of the search."  <u>Meeropol</u>, 790 F.2d at 953 (citation and quotation omitted).  Accordingly, CREW's second argument is wholly without merit.

CREW's third argument against the reasonableness of the search is equally flawed.  CREW asserts that DHS should have identified certain categories of records as being responsive earlier than it did.[9]  Opp. at 13-15.  DHS already has demonstrated that the search which

_____

[9] CREW incorrectly argues that the lag time between DHS's identification of categories of records as potentially responsive and its notification to the Court of the existence of these categories demonstrates that DHS has not conducted a reasonable search.  Even if there were a lag, that would not cast doubt on the reasonableness of the search, as qualified individuals used appropriate methods to look for records in places where they are reasonably likely to be found,

preceded the motion to dismiss was reasonable, Opening Memo. at 9, and it need not retread that ground. In any case, DHS has searched those categories of records that were reasonably likely to contain responsive records at the time that the categories were identified as being potentially responsive, see above at 3-4; in all, after more than 18 months of litigation, DHS has searched 15 categories of documents and released hundreds of pages of responsive records. Reasonableness is the touchstone of the FOIA, and the Secret Service has conducted a reasonable search. CREW's third argument fails.

Finally, CREW suggests without support that DHS has improperly refused to search unnamed potentially responsive documents at the urging of the White House. Opp. at 16. This suggestion is simply false. That certain searches have been conducted, and certain documents released, only with the authorization of the OVP and/or the OP simply reflects the government's legal position that certain records are presidential records controlled by these entities. Memorandum of Points and Authorities in Support of Defendants Motion for Summary Judgment [in CREW II], May 25, 2007, Doc. No. 29 ("Memo. in Support of SJ in CREW II"), at 19-32. Those records remain in the control of the OVP and/or the OP respectively, and so cannot be searched or released without permission. Id. DHS has not forborne from searching potentially responsive records in its possession that were reasonably likely to contain responsive records at the time that they were identified as being responsive, and there is no evidence to suggest the contrary. Accordingly, CREW's argument is untenable.

---

see, e.g., Memo. in Support of Motion to Dismiss at 6-8. In any case, DHS has moved expeditiously to provide the Court with accurate information regarding this case.

In short, DHS has demonstrated that it conducted a reasonable search, and CREW has not undermined that demonstration.[10]

## II.    **Sensitive Security Records Have Been Properly Withheld Under the FOIA**

DHS has retrieved one or more potentially responsive Sensitive Security Records with respect to one or more of the individuals named in plaintiff's FOIA request.  The Glomar doctrine and FOIA Exemptions 2, 7(E), and 7(F) shield these records from disclosure.  Revealing such records would disclose a law enforcement technique, which is also a matter of agency practice, and compromise the Secret Service's ability to carry out its protective function.  Opening Memo. at 10-20.  Nonetheless, plaintiff asks the Court to require DHS to disclose these records.  The Court should reject plaintiff's entreaty.

### A.    The Glomar Doctrine Shields the Sensitive Security Records from Disclosure

DHS has established that the Glomar doctrine protects the Sensitive Security Records from disclosure.  Opening Memo. at 10-11; Ulmer Decl. ¶ 22.  The Glomar doctrine permits an agency to decline to confirm or deny the existence of responsive records when "the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007).  DHS cannot confirm or deny the existence of responsive

---

[10]  In its response, CREW reiterates the request made in its response to DHS's motion to dismiss that it be allowed to conduct discovery because DHS allegedly has conducted an inadequate search.  Opp. at 3 n. 3; Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's FOIA Claims and Request for Discovery, September 28, 2006, Doc. No. 48 in Case No. 06-CV-883, at 16.  As demonstrated in the opening brief and this memorandum, the Secret Service has conducted a reasonable search.  Opening Brief at 8-10.  Thus, discovery, which is to be "sparingly granted" in FOIA cases, is not warranted.  See Pub. Citizen Health Research Group v. FDA, 997 F. Supp. 56, 72 (D.D.C. 1998), aff'd in part, rev'd in part, 185 F.3d 898 (D.C. Cir. 1999).  CREW's discovery request bears other defects as well.  DHS previously has addressed those defects, and it hereby adopts those arguments by incorporation.  Reply in Support of Motion to Dismiss at 16-17.

Sensitive Security Records as to any specific individual because to do so would allow those so inclined to determine when additional security measures are undertaken and, thereby, facilitate the evasion of those measures: "Disclosing any potentially responsive information (including whether a search for a particular individual's name located, or did not locate a record) could, when repeatedly combined with other similar information, reasonably be expected to enable individuals to circumvent the law by revealing information regarding the circumstances that trigger when security steps are taken, and the manner through which those additional security checks are taken or information is gathered." Ulmer ¶ 22. Ensuring that records that would otherwise be released under the FOIA do not facilitate the circumvention of the agency practices or reveal law enforcement techniques is an interest protected by the FOIA Exemptions 2 and 7(E). 5 U.S.C. §§ 552(b)(2), (b)(7)(E). FOIA Exemption 2 relieves an agency of the duty to release "predominantly internal" information that could be used to circumvent agency rules or practices, Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992), and "Exemption 7(E) provides categorical protection to information related to law enforcement techniques," Smith v. ATF, 977 F. Supp. 496, 501 (D.D.C. 1997).

CREW contends that the Glomar doctrine does not apply for three reasons: (1) the declarations filed by DHS do not support its invocation; (2) DHS has acknowledged the existence of records relating to visits by Jack Abramoff and his associates to the White House Complex; and (3) DHS has previously acknowledged the existence of Sensitive Security Records. Opp. at 18-19.

None of CREW's arguments has merit. The above-quoted language from paragraph 22 of the Ulmer declaration supports the invocation of the Glomar doctrine: It provides sworn factual

12

support for the argument that disclosing whether there exist Sensitive Security Records with respect to any individual named in the FOIA request would reveal law enforcement techniques (which are also matters of agency practice) and thereby facilitate circumvention of these techniques, undermining the Secret Service's ability to carry out its protective function. Ulmer ¶ 22; 5 U.S.C. §§ 552(b)(2), (b)(7)(E); Wolf, 473 F.3d at 374.

Also, that DHS has acknowledged the existence of records relating to visits by Jack Abramoff and his associates does not mean that DHS has waived its right to employ the Glomar doctrine. Pursuant to the official acknowledgment doctrine, an agency waves the ability to invoke Glomar with respect to records that have been acknowledged to exist (and other records that convey the same information), not all records about an individual. Wolf, 473 F.3d at 379-380. DHS has not officially acknowledged the existence or non-existence of Sensitive Security Records relating to any specific individual. In accord with Wolf (and common sense), DHS has not waived its ability to refuse to confirm the existence of Sensitive Security Records relating to any specific individual simply because it has acknowledged the existence of (and, in fact, has released) other records which reflect visits to the White House Complex. These records do not reveal the security-related information, namely, the circumstances in which additional security measures are undertaken, that would be disclosed by acknowledging the existence or non-existence of Sensitive Security Records related to a specific individual. Ulmer ¶ 22.

Plaintiff's third argument founders for the same reason that its second does: That DHS has acknowledged in CREW II that Sensitive Security Records have been generated in relation to unspecified visits by unspecified visitors, none of whom are the subject of the FOIA request underlying this litigation, does not obviate DHS's ability to employ the Glomar doctrine. See

Memo. in Support of SJ in CREW II at 34. Also, in CREW II, the Secret Service did not

acknowledge the existence of Sensitive Security Records with respect to any specific individual

or visit.[11] Id.

        B.      The Sensitive Security Records are Exempt from Disclosure Pursuant to
              Exemption 2

FOIA Exemption 2 also shields Sensitive Security Records from disclosure. FOIA

Exemption 2 relieves an agency of the duty to release "predominantly internal" information that

could be used to circumvent agency rules or practices. Schiller v. NLRB, 964 F.2d at 1207. The

D.C. Circuit has held that a record is predominantly internal if it is "used for predominantly

internal purposes." Crooker v. ATF, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (en banc). These

records are used for predominantly internal purposes, namely, alerting the Secret Service to

potential security threats and allowing it to most closely scrutinize those White House Complex

visitors and visits that might present the most serious risk. Opening Memo. at 14. And

disclosing these records would provide insight into the circumstances in which the Secret Service

undertakes certain additional security measures, thereby facilitating the circumvention of the

Secret Service's security practices. Id. In Schwarz v. United States Department of Treasury, 131

F.Supp. 2d 142, 150 (D.D.C. 2000), the court concluded that "information concerning personal

characteristics used by the Secret Service in evaluating the dangerousness of a subject and the

---

[11] CREW concludes the Glomar portion of its brief by suggesting that the Secret Service
has invoked the Glomar doctrine to prevent high officials from embarrassment, not to protect
legitimately exempt information that, if revealed, could compromise its protective function. Op.
at 19. This argument is baseless. As demonstrated above, the Secret Service properly has
invoked the Glomar doctrine. What is more, a sworn Secret Service agent stated under oath that
releasing the information would undermine the Secret Service's ability to perform its protective
function, and the law affords a presumption of good faith to government declarants. See
Safecard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

threat potential to individuals protected by the Secret Service" is "clearly exempt from

disclosure" pursuant to Exemptions 2 (and 7(E)).  The same is true here.

CREW posits two basic objections to the application of Exemption 2 to the Sensitive

Security Records.  First, CREW contends that DHS has not established that the records relate

predominantly to internal rules and practices, especially in light of the fact that the records are

created in conjunction with the Secret Service's statutory protection responsibility, "which is not

predominantly an internal administrative matter."  Opp. at 21-22.  Second, CREW maintains that

DHS has not demonstrated that disclosing distinct pieces of information from the records, such

as the names of the visitor and visitee and the dates and times of the visits, could result in the

kind of harm that Exemption 2 is supposed to prevent.[12]  Opp. at 22.

Both of CREW's objections are meritless.  The D.C. Circuit has held that a record is

predominantly internal if it is "used for predominantly internal purposes."  Crooker, 670 F.2d at

1073.  And the Secret Service uses Sensitive Security Records for an internal purpose, i.e., to

allow it to employ its resources effectively to fulfill its protective duty.  Opening Memo. at 14.

That a statute imbues the Secret Service with the duty to protect does not mean that the record is

a matter of secret law (i.e., a regulation that primarily regulates the conduct of the public and is

unprotected by Exemption 2), rather than a record used to facilitate the agency's internal

---

[12] CREW suggests in passing that DHS has not justified its withholding, pursuant to Exemption 2, of certain trivial information from Sensitive Security Records because DHS did not adequately explain in its brief what that trivial information consists of.  Opp. at 20.  This suggestion rings hollow.  The objected-to portion of DHS's brief cites paragraph 21 of the Ulmer Declaration, which contains the following description of the trivial information: "Potentially responsive information withheld under Exemption (b)(2) includes letter/number sequences associated with access control officers in Sensitive Security Records.  These pieces of information relate strictly to the internal operation of the system and provide no information to the public."  DHS adequately described (and withheld) the trivial information.

operations.  See, e.g., Schiller, 964 F.2d at 1207.  After all, every agency is a creature of statute and, accordingly, is assigned its responsibilities by statute.  No record would qualify for Exemption 2 if "internality" were vitiated by the existence of a responsibility-conferring statute. Rather, the test of "internality" is what the D.C. Circuit says it is:  A record is predominantly internal if it is "used for predominantly internal purposes."  Crooker,  670 F.2d at 1073.  As DHS has established, these records are used for predominantly internal purposes.  Opening Memo. at 14.  And of course, the Schwarz court held that similar records satisfied Exemption 2's predominantly internal requirement.  See Schwarz, 131 F. Supp. 2d at 150.

What is more, DHS has demonstrated that disclosing the pieces of information adverted to by CREW could result in the kind of harm that Exemption 2 is designed to protect against, namely, circumvention of agency practices.  Disclosing the names, dates, and times on Sensitive Security Records would suggest the circumstances in which additional security checks are undertaken (particularly when viewed in conjunction with other information potentially available to the public), and thus would facilitate the circumvention of these security checks, which are a matter of agency practice.  Ulmer Decl. ¶ 22; see also Schwarz, 131 F.Supp. 2d at 150.

C.    The Sensitive Security Records are Exempt from Disclosure Pursuant to Exemption 7(E)

Like Exemption 2, Exemption 7(E) protects the Sensitive Security Records from disclosure.  This provision exempts records from disclosure to the extent that disclosing the records "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E).  Sensitive Security Records are created as part of conducting additional background checks and other security-related activities regarding certain

visitors who are chosen based on certain details in their backgrounds and/or the circumstances of their visits.  See Ulmer Decl. ¶ 10; Second Declaration of Paul S. Morrissey, Dec. 11, 2007 ("Second Morrissey Decl."), ¶ 3 (attached as Exhibit 1 to Opening Memo.).  Disclosing these records would provide insight into the criteria – not generally known to the public – that DHS uses in choosing visitors for these additional background checks and other security-related activities.  See Ulmer Decl. ¶ 22.  The criteria used in selecting visitors for additional background checks are "techniques and procedures" of law enforcement.  See Moorefield v. U.S. Secret Service, 611 F.2d 1021, 1025-26 (5th Cir. 1980); Schwarz, 131 F. Supp. 2d at 150.

　　　CREW advances two arguments in opposition to applying Exemption 7(E) to Sensitive Security Records.  Consonant with its objection to the application of Exemption 2, CREW insists that DHS has not shown that releasing information about names, dates, and times would inflict the injury against which Exemption 7(E) is set.  Opp. at 25-26.  Indeed, in this portion of its brief CREW declares that it is "inherently implausible" that "revealing the names of the visitor and who he or she was visiting could suggest when additional security checks are conducted and when certain security measures are not, or are unlikely, to be taken."  Opp. at 26 (citation and quotation omitted).  CREW also argues that the exemption should be held inapplicable because revealing that the Secret Service conducted a background check before a meeting would not reveal anything about the Secret Service's techniques and procedures that is not already known, for "the Secret Service has already acknowledged publicly that it conducts investigations of potential White House visitors."  Opp. at 25.

　　　These arguments are untenable.  DHS has shown that releasing the information it seeks would disclose techniques and procedures for law enforcement by laying bare the circumstances

in which the Secret Service conducts certain additional security procedures. See Ulmer Decl. ¶ 22. As in Schwarz, releasing this information would provide a window into how the Secret Service assesses threats, thus, as in Schwarz, this information (and these records) are exempt from disclosure. Schwarz, 131 F. Supp. 2d at 150. CREW, in fact, recognizes the harm that DHS asserts would attend the release of these records, but, with respect to the names of the visitor and the visitee, nonchalantly dismisses the assertion as "inherently implausible." Opp. at 26. There is nothing "inherently implausible" about the notion that information about the identity of the visitor and the visitee could suggest the circumstances in which additional security checks are conducted, as one would expect that the identity of the visitor and visitee would matter for determining whether to conduct security procedures.

CREW's second argument fares no better. Revealing the circumstances in which additional security procedures are performed would indeed reveal something about the Secret Service's techniques and procedures that is not already known, namely, the circumstances in which additional security procedures are performed. Disclosing this information would furnish a roadmap for evasion of these additional procedures, undermining the Secret Service's ability to carry out its protective duties.

D.    Exemption 7(F) Shields the Sensitive Security Records from Disclosure

Exemption 7(F) also protects the Sensitive Security Records. Exemption 7(F) of the FOIA exempts from disclosure "records or information compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Disclosure of Sensitive Security Records would reveal certain "techniques and procedures" used by defendant in carrying out its protective

18

responsibilities, by revealing when various security checks and security measures are taken in connection with individuals seeking entrance into the Complex. Ulmer Decl. ¶ 24. Disclosing those techniques and procedures would facilitate an individual's or organization's attempts to avoid certain security checks, potentially impeding the Secret Service's efforts to identify persons who may be a threat to its protectees. Id. Because the function of Secret Service includes the protection of particular personnel, disclosing these records "could reasonably be expected to endanger the life or physical safety" of one or more Secret Service protectees, 5 U.S.C. § 552(b)(7)(F). See Ulmer Decl. ¶ 24.

CREW attacks DHS's invocation of Exemption 7(F) with two of the same arguments that it leveled against the application of Exemption 7(E), namely, that DHS has not demonstrated (i) how releasing information like the identity of the visitor could facilitate evasion of the additional security procedures and (ii) how the information about the additional security procedures is different from information that already resides in the public domain. Opp. at 27. But CREW does add one new argument to this section of its brief: CREW suggests that it makes little sense to withhold (at least certain) information from the Sensitive Security Records because "the visitors themselves * * * clearly know the circumstances of their visits and * * * those visitors are [not] precluded from publicly disclosing that information." Opp. at 27. The implication is that there is no sense in withholding the information because it is already in the public domain. Id.

DHS has already dispatched the first two arguments, see 17-18 above, and for the sake of brevity will no do so again here. As for CREW's new argument, it too suffers from a fatal flaw. While it is true that visitors should know the circumstances of their own visits, they presumably

do not know whether their visit triggered the creation of a Sensitive Security Record, and the

source of information about a visit matters.  If the source of information is a Sensitive Security

Record, people will know such a record was generated by a visit.  If the source is the visitor,

people will not know whether a Sensitive Security Record was generated by a visit.  Revealing

information from a Sensitive Security Record, then, will disclose information not in the public

domain.  DHS appropriately invoked Exemption 7(F).[13]

---

[13] In the last section of its brief, CREW challenges DHS's statement that the name of the person requesting that an individual be given access – i.e., the person who conveys the access request to the Secret Service – is protected from disclosure pursuant to Exemptions 6 and 7(C). Opp. at 27-29.  The challenge fails.  First, CREW suggests that the Ulmer declaration is silent with regard to the privacy interest of these individuals.  Id. at 28.  But that is not the case: The Ulmer declaration states that these individuals face unwanted public attention or unnecessary and unwanted contact.  Ulmer Decl. ¶ 30.  Second, CREW argues, without citation, that persons requesting access have no legitimate privacy interest simply because the documents relate to their work for the government.  Opp. at 28.  This argument is clearly wrong.  The D.C. Circuit, for example, has long recognized that investigators have a privacy interest in not having their names disclosed in relation to their work for the public.  See, e.g., Dunkelberger v. U.S. Dep't of Justice, 906 F.2d 779, 781 (D.C. Cir. 1990).  Third, CREW points out that the WAVES records already released in this case contain the names of individuals requesting access with respect to visits reflected in those records.  Opp. at 28.  That is true, but it does not mean that DHS must release the information with respect to these records.  Finally, CREW indicates that it wants the names of the access requestors in order to find out information about top government officials. Id.  In effect, CREW seeks to get through the back door what it cannot get through the front, namely, the visitee listed on a Sensitive Security Record.  As the WAVES records reflect, the people making these access requests typically are not top government officials, but lower level staff members.  Nonetheless, releasing the identity of the person requesting access would enable CREW to ascertain information about the person visited, because the name of a staff member can usually be tied to a specific senior government official for whom the staff member works.  And as explained above, releasing the name of the visitee from a Sensitive Security Record would provide a window into the circumstances in which the Secret Service undertakes additional security measures, and thereby undermine the Secret Service's ability to carry out its protective function.  CREW should not be allowed to make an end run around the protections provided by the Glomar doctrine and Exemptions 2, 7(E), and 7(F).

## CONCLUSION

For the above-stated reasons, and those provided in DHS's opening memorandum, the

Court should enter summary judgment in favor of DHS on CREW's FOIA claims.


Dated: January 25, 2008                    Respectfully submitted,

                                           JEFFREY S. BUCHOLTZ
                                           Acting Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           United States Attorney

                                           CARL J. NICHOLS
                                           Deputy Assistant Attorney General

                                           JOSEPH H. HUNT
                                           Branch Director

                                           ELIZABETH J. SHAPIRO
                                           Assistant Branch Director

OF COUNSEL:                                s/ Justin M. Sandberg
                                           JUSTIN M. SANDBERG
LIZA MURPHY                                (Ill. Bar. No. 6278377)
MOLLY WEBER                                Trial Attorney
United States Secret Service               United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue, N.W. #7224
                                           Washington, D.C. 20001
                                           Telephone:  (202) 514-3489
                                           Facsimile:  (202) 616-8202
                                           E-mail:  justin.sandberg@usdoj.gov

                                           Attorneys for Defendant